THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL LEE, Defendant-Appellant.

First District (3rd Division)   No. 1—99—2325

Opinion filed March 26, 2003.—Rehearing denied July 14, 2003.—Modified opinion filed July 16, 2003.

Michael J. Pelletier and Manuel S. Serritos, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Margaret J. Campos, and Clare Wesolik Connolly, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

The defendant admits he was present in his apartment when Nannette Krenzel (Krenzel) was stabbed to death. He also admits he helped remove the dead body and then dump it just over the border, in Wisconsin. At trial and on appeal the defendant, through his lawyer, contends his wife, acting alone, committed the murder. The jury did not buy it. Neither do we.[1]

---

[1]On February 5, 2003, the supreme court directed us to vacate our judgment entered in this case on January 31, 2001, and to reconsider our decision in light of *People v. Swift*, 202 Ill. 2d 378, 781 N.E.2d 292 (2002), where the court held that the sentencing range for first degree murder in Illinois is 20 to 60 years' imprisonment and that any factual findings that take a sentence above the range must be proven to a jury beyond a reasonable doubt. We did so and refiled our opinion with modifications. *People v. Lee*, No. 1—99—2325 (March 26, 2003). Just five days later, our supreme court issued a supplemental opinion to *People v. Crespo*, 203 Ill. 2d 335, 788 N.E.2d 1117 (2001), in which the court employed for the first time a plain-error analysis in rejecting the defendant's *Apprendi*-based challenge to his extended-term sentence. At the time, this case was still before us on the State's petition for rehearing. After receiving arguments from the parties on the impact of *Crespo* on this case, we

BACKGROUND

A jury convicted defendant Michael Lee of first degree murder for the stabbing death of Krenzel. The trial court found the crime exceptionally brutal and heinous and sentenced defendant to an extended term of 70 years in prison.

Defendant appeals both his conviction and sentence, and raises the following issues: (1) whether the State proved him guilty beyond a reasonable doubt; (2) whether defendant was allowed to adequately present his theory of defense during opening statements; (3) whether the trial court erred when it refused to allow him to introduce evidence he believed was relevant to his theory of defense; (4) whether the trial court erred in allowing the State to introduce evidence of a "prior domestic disturbance"; (5) whether the trial court erred in its answers to two questions asked by the jury during deliberations; (6) whether the trial court erred in considering poems written by the victim's daughter as part of a victim impact statement; and, in a supplemental brief, (7) whether defendant's case should be remanded for resentencing pursuant to *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

We affirm defendant's conviction and sentence.

FACTS

Krenzel was stabbed to death on May 13, 1995. Her body was left a few feet from a Wisconsin highway, just across the Wisconsin/Illinois border.

At defendant's trial, Jacob Stutz (Stutz), Krenzel's boyfriend, testified he and Krenzel were living together in a northwest Chicago apartment in May 1995. On May 12, 1995, Stutz went to a pub to watch a basketball game with his stepfather, his brother, and his brother's girlfriend. At about 9:30, Krenzel came into the bar. She was wearing a black windbreaker, black jeans, and sneakers. Stutz testified Krenzel also was wearing two rings and a bracelet, jewelry she always wore.

Stutz and Krenzel argued. They ended their argument outside the bar and Stutz told Krenzel their relationship "[was] over." Stutz decided to leave but found his brother's car was blocking his van. He asked his brother to move his car. As he was leaving he saw Krenzel walking east in an alley by the pub. When Krenzel didn't return home that night or the next day, Stutz began calling her family and friends in an attempt to find her. On May 15, 1995, he called the police and reported Krenzel missing.

vacate our March 26, 2003, opinion and modify our decision to affirm the defendant's sentence consistent with the supreme court's decision in *Crespo*.

The police called Stutz on May 16, 1995, and told him a woman's body was found in Wisconsin. Stutz went to the police station in Kenosha, Wisconsin, where he was shown a photograph of the body. Stutz identified the woman as Krenzel.

Donna Kilburn (Kilburn) testified she and defendant married in June 1994. In December 1994, they moved into the basement of the same Chicago apartment building where Kilburn's parents lived.

On April 24, 1995, Kilburn and defendant got into an argument. Kilburn testified she picked up a baseball bat and started swinging it at defendant. As she and defendant were struggling over the bat, it hit Kilburn on the side of the head and her ear began bleeding. During the argument, Kilburn's father came downstairs. When he saw Kilburn's injury, he "went after" defendant. According to Kilburn, defendant put his arms around her father to restrain him and they both fell to the floor. Kilburn's father landed on the concrete base of a pillar, cracking a rib and puncturing his lung. Kilburn's father was admitted to the hospital and treated for his injuries.

Kilburn testified she had an argument with one of the police officers that came to the hospital because he would not take a statement from her. The officer wanted to speak to Kilburn's father directly but was not able to. Kilburn was angry because the officer was going to leave the hospital without making a report of the incident. Later, Kilburn and her mother filed charges at the police station on behalf of her father.

After that incident, defendant moved out of the basement apartment he shared with Kilburn and moved in with her brother. On May 12, 1995, defendant called Kilburn and asked if they could meet that evening. She agreed and defendant picked Kilburn up from work.

At around 10:30, Kilburn and defendant went to a bar located at the corner of Western and Addison Streets in Chicago. Kilburn described the bar as "primarily a lesbian bar" and during cross-examination said she and defendant joked about "picking up" another woman. After Kilburn and defendant had a couple of drinks, a woman Kilburn identified as Krenzel entered the bar and sat down next to defendant. Kilburn said Krenzel was wearing jeans and a black windbreaker.

According to Kilburn, Krenzel appeared inebriated. She started a conversation with defendant and borrowed cigarettes from him. Krenzel told them she came to the bar on a friend's dare. Kilburn said she and defendant stayed at the bar for a couple of hours. Just before they left, Krenzel started to leave. On her way out, Krenzel stopped at a table near the door and began insulting some of the other patrons. Kilburn and defendant decided to help get Krenzel out of the bar

before she got hurt. The three of them left the bar together, and Kilburn asked Krenzel if she wanted a ride home. Krenzel said her grandmother lived close to the bar. When they got into the car, Krenzel wasn't able to give clear directions to the house and suggested they go to another bar up the street. Kilburn and defendant agreed.

When they arrived at the second bar, Kilburn and defendant saw several of their friends. Defendant began playing darts and Kilburn sat with her friends Esther Hinterhauser, Tracy Lizak, and Holly Ubrig.

Krenzel walked around and talked to several people. She started singing karaoke and fell off the stage. Krenzel walked over to the table where Kilburn was sitting and spilled a drink on her. Kilburn told defendant she wanted to leave. Krenzel left with them. Kilburn said the three of them were in the bar for about 20 minutes before they left.

After they left the bar, defendant, Kilburn, and Krenzel got into defendant's car. Krenzel said she wanted to go back to the bar where her boyfriend was watching the basketball game earlier in the evening. She told them she could walk home from there. Kilburn and defendant told Krenzel they didn't want to go to another bar. At some point, the three of them instead decided to buy a six-pack of beer and go back to Kilburn and defendant's apartment.

Kilburn testified Krenzel was very loud as they were entering the apartment and she told Krenzel to "quiet down." Once they were inside the apartment, Kilburn changed her clothes because they were wet from the drink Krenzel spilled on her. Krenzel sat on the couch in the living room and asked defendant to turn on the radio. After she changed clothes, Kilburn brought beer to defendant and Krenzel. When Kilburn saw Krenzel leaning over defendant, she indicated to Krenzel that defendant was her husband.

At some point, Kilburn went to the back bedroom "to get away from [Krenzel] for a little while." Kilburn's children normally stayed in the back bedroom, but they were not there that night. A bunk bed was in the back bedroom, but because Kilburn's children broke her waterbed, the mattress of the lower bunk was in her bedroom. Kilburn laid down on the top bunk.

Kilburn testified she heard a banging noise soon after she went into the back bedroom. She walked into the front bedroom and saw Krenzel unclothed, lying face-up on the mattress on the floor. Defendant was positioned over Krenzel. When Kilburn walked over, she noticed bruises on Krenzel's face and blood on her neck. Though Kilburn testified she did not know what defendant hit Krenzel with, during a pretrial interview she told the assistant State's Attorney she saw defendant hit Krenzel with a bat.

Kilburn testified she saw defendant cut Krenzel's neck with a knife. He placed the knife into Krenzel's neck and pulled it out. Krenzel started making a "gurgling noise," and Kilburn testified she and defendant put a pillow over Krenzel's face. Though Krenzel struggled, she eventually quit fighting and making noise. Kilburn said they cut and stabbed Krenzel multiple times. Kilburn testified defendant had the knife first and then gave it to her. She used it.

After they finished stabbing Krenzel, defendant went to get his car. When he returned, they rolled Krenzel's body in their comforter and carried her to the trunk of the car. They drove to Wisconsin, where defendant pulled off the interstate onto a side road. He parked and got out of the car, but he got back in and drove a little farther when he saw some other cars pass by. When he pulled over again, he got out and took Krenzel's body out of the trunk. Kilburn did not get out of the car and did not see how Krenzel's body was left. Defendant got back into the car and drove home.

Once they got back to their apartment, defendant asked Kilburn to make a pot of coffee. After she made coffee, Kilburn told defendant she had a headache. Defendant gave Kilburn medicine for her headache and she fell asleep on the couch. When she woke up, the apartment was clean. The mattress was in the furnace room. Defendant was trying to clean blood out of the carpet, but he wasn't able to get the stain out. Kilburn finished cleaning the carpet. Defendant and Kilburn did not leave the apartment that day.

May 15, 1995, was Mother's Day, and Kilburn spent the day with her mother and several other relatives. Kilburn left early and went home. A couple of weeks later, Kilburn quit her job. She and defendant moved to Arkansas around Memorial Day 1995, without telling anyone where they were going.

Kilburn called her mother just before Christmas 1995. She did not tell her anything about the murder during this conversation. On December 28, 1995, Kilburn called her mother again. Kilburn's mother told her she knew why they left Chicago and asked "what the woman looked like." Kilburn told her the woman had dark hair and green eyes. During another conversation in January 1996, Kilburn told her mother she and defendant moved Krenzel's body in a car. Kilburn said defendant never could come back to Chicago.

Kilburn testified her relationship with defendant was "wonderful" while they were in Arkansas. On January 29, 1996, the police arrived at the Arkansas apartment Kilburn shared with defendant. They questioned Kilburn about Krenzel's murder, and she initially told them she was responsible for it. The police searched the apartment and confiscated a knife belonging to defendant. When Kilburn was questioned at the police station, she told them defendant was involved.

Kilburn testified before the grand jury in Chicago. She then returned to Arkansas to move their things out of the apartment. While she was packing their things, she found an old purse. Kilburn initially threw the purse away, but her mother looked inside it and found jewelry. Kilburn gave the jewelry to the police when she realized it was not hers. Several witnesses testified the jewelry belonged to Krenzel.

Kilburn testified she felt responsible for Krenzel's death for several reasons. She said she suggested they help get Krenzel out of the bar before she got into a fight. Kilburn felt she could have insisted Krenzel find her own way home. Kilburn said she also felt responsible because of her "involvement that night." Finally, Kilburn felt she should have done something to help her husband before he had "these troubles."

During cross-examination, defense counsel asked a number of questions concerning Kilburn's temper. She also was asked about the April 24, 1995, incident that resulted in the injuries to her father. She said she was the first to pick up the bat and swing it at defendant. She said defendant never hit her father and was simply trying to restrain him when he was injured. When the police refused to take a report at the hospital, she yelled at one of the officers and was arrested for disorderly conduct.

Defense counsel also asked her whether she and defendant had been to the lesbian bar where they met Krenzel prior to that night. She said they had and indicated she and defendant joked about "picking up" another woman on the night they met Krenzel.

During cross-examination, Kilburn said she was in the front bedroom with defendant and Krenzel before she went into the back bedroom. Kilburn denied she "made a pass" at Krenzel, then became angry when Krenzel rejected her. When she was asked whether she punched Krenzel in the face, she said "I believe I did." Kilburn said she and defendant both stabbed and cut Krenzel. Kilburn said she was not "enraged" when she participated, nor was she drunk.

While they were in Arkansas, Kilburn managed the apartment complex they lived in and worked as a certified nurse's aid. Defendant worked as a mechanic for Wal-Mart. She testified she never felt like a hostage during the time they were in Arkansas and had a "good life" there.

Defense counsel also asked Kilburn if she had written to defendant during the time he was in custody. She said she had written him many letters. Counsel asked if she wrote a letter in which she said she "[could not] believe [she is] allowed to live in society." She was also asked whether she wrote a letter in which she said "For some

unknown reason, I am allowed to continue living in society while the person I put my whole world into is an inmate" and "Why I am not [*sic*] being punished by society as well, why am I financially content?" In a Valentine's Day card Kilburn sent defendant in 1997, she wrote, "Thank you for my freedom. I should show you my appreciation more often." Finally, Kilburn was asked whether she wrote a letter in which she said, "I am sorry for the pain I have caused you. I do appreciate the freedom and opportunities you have made available to me. At times, I truly do not know how I am to deal with all of this." Kilburn agreed that she wrote the letters and explained the statements:

> "I thanked him for allowing me the opportunities that I had at that time because I felt I could help him. I haven't been there beside him for the last three years, but there were plenty of times that I did what he needed and provided some of the things he wanted, and I apologized because I should have been stronger in our relationship and done more to prevent this."

Defense counsel asked Kilburn about a telephone harassment charge he alleged was pending against her. According to defense counsel, the charges were filed by the ex-wife of Kilburn's former boyfriend, Bob Burnetter. Kilburn said she didn't know of any pending charges but had spoken to Burnetter's wife on the phone when they were arguing.

During redirect examination, Kilburn said she did not stab Krenzel because she was jealous. When she was asked why Krenzel died, she said, "It was her destiny." Kilburn never was charged with any crime related to Krenzel's death. She testified she had not been offered any leniency in exchange for her testimony. The record offers no explanation of why Kilburn was not charged with any offense in the absence of a promise of immunity or leniency.

Tracy Lizak (Lizak) testified she had known defendant for about 18 years. On May 12, 1995, into the early morning hours of May 13, 1995, Lizak was at the bar where defendant and Kilburn took Krenzel. She saw defendant come into the bar with Kilburn and another woman. Lizak had never seen the woman with Kilburn and defendant before that night and described her as having shoulder-length brown hair, wearing dark clothes. Lizak identified Krenzel as the woman who was with Kilburn and defendant. After they walked into the bar, Kilburn and Krenzel sat with Lizak and her friends. Lizak testified Krenzel left the bar with Kilburn and defendant. Lizak saw the three of them get into a car together and drive away.

Eugene Heckel testified he was working as a police officer for the Pleasant Prairie, Wisconsin, police department in May 1995. Pleasant Prairie is about 55 miles north of Chicago; it borders the state line

between Illinois and Wisconsin. On May 13, 1995, Officer Heckel worked the 11 p.m. to 7 a.m. shift and was assigned to "general patrol." At about 6:40 a.m., the officer was asked to investigate a report of a body found near the highway.

The officer drove to that area and parked his car. He saw the body of a white female lying on her back in the grass, about 10 to 15 feet off the roadway. Officer Heckel said the woman did not appear to be breathing, there was no blood coming from any of the injuries below the head or neck, and he saw what appeared to be "lividity," or pooling of the blood, in the waist area.

Doctor Mark Witeck testified he was the medical examiner who performed the May 13, 1995, autopsy on Krenzel's body. He found contusions, or bruises, on both sides of her face and a stab wound to her right eye. The stab wound to her eye caused a hemorrhage in the surrounding tissue and a fracture of the orbital plate. Krenzel had a composite wound to her neck caused by multiple, overlapping wounds. Krenzel's airway was severed, as was her jugular vein. Dr. Witeck testified a person could only survive that type of injury for five or six minutes.

Dr. Witeck testified Krenzel suffered at least 40 stab and cutting wounds in all. Krenzel's internal injuries included stab wounds to her left lung and liver. Many of the wounds appeared to have been inflicted after Krenzel died. Dr. Witeck testified Krenzel had a blood-alcohol level of .302 when she died. Dr. Witeck attributed Krenzel's death to multiple stab and cutting wounds. He said the wounds were consistent with the knife taken from defendant's Arkansas apartment.

Daniel Stankus, a Chicago police officer, testified he was a forensic investigator. Officer Stankus said forensic investigators are responsible for photographing the scenes of serious crimes as well as searching for, collecting, and preserving evidence at the scene. On February 6, 1996, Officer Stankus was assigned to do follow-up investigation relating to Krenzel's death. He was asked to photograph and search the Chicago apartment where defendant and Kilburn lived before they moved to Arkansas. Detective Stankus took photographs of the apartment and searched for residual blood inside the apartment. In the front bedroom of the apartment, Stankus found a stain on the back side of the carpet. He took photographs of the stain and removed that section of the carpet. It was sent to the lab for further analysis.

Denise Troche testified she was a criminalist at the Chicago Crime Laboratory in February 1996. She examined and tested the carpet sample taken by Officer Stankus and determined human blood was present on the sample. She also tested defendant's knife, recovered from the Arkansas apartment, and its sheath for the presence of blood.

The sheath tested negative for the presence of blood. Though the knife was positive for the presence of blood, the sample was too small to determine whether the blood was human.

The parties stipulated Sarah Thibault was an expert in the field of DNA analysis and examination for the Illinois State Police Crime Lab. Thibault compared blood standards from defendant and Krenzel against the blood found on the carpet sample collected by Officer Stankus. Defendant was excluded from contributing to the DNA in the blood sample taken from the carpet, but the sample was consistent with having originated from Krenzel.

Sharon Kilburn (Sharon) testified her daughter, Donna Kilburn, was married to defendant. Sharon said she had known defendant since he was a child.

On December 23, 1995, Sharon received a telephone call from Kilburn. During that conversation, Kilburn told her mother why she and defendant left Illinois. Sharon guessed that they had moved to Arkansas, but Kilburn would not tell her mother exactly where they were living. Sharon had another telephone conversation with Kilburn in late December 1995. After that conversation, Sharon spoke to detectives with the Chicago police department and the Kenosha, Wisconsin, sheriff's department. She gave the police the information Kilburn had given to her during their telephone conversations.

Chicago police sergeant Richard Schak testified he was assigned to investigate Krenzel's homicide. He went to Arkansas to speak to Kilburn and defendant. When the sergeant arrived at their apartment, Kilburn was home. She spoke to Sergeant Schak about the murder. In that initial conversation, she did not tell Sergeant Schak she had the knife in her hands during the murder. Defendant was arrested that day, but Kilburn was not charged with a crime.

Sergeant Schak testified he was present when Kilburn was interviewed by an assistant State's Attorney on April 17, 1999. At that interview, Kilburn said defendant placed the knife in her hands and put his hands on top of hers. While they were cutting the victim's breasts, defendant asked Kilburn, "Is this hurting you, does this hurt?" Schak said that was the first time they learned the knife had been in Kilburn's hands, but he said they still did not charge her with a crime. Schak said Kilburn was not offered any leniency in exchange for her statements.

Over the State's objection, the trial court allowed Kilburn's ex-boyfriend, Robert Burnetter, to testify for the defense. He said he dated Kilburn for about three years and they lived together for two of those three years. According to Burnetter, in the summer of 1998 Kilburn became enraged when he mentioned a female coworker had a

new hairstyle. He said Kilburn became more and more agitated and became violent.

Burnetter called Kilburn's mother, at which point Kilburn started screaming and threatening Burnetter with a knife. Burnetter pled with Kilburn to put away the knife. Kilburn "started jumping in the air, and *** stabbed herself in the chest with the knife." She fell to the floor and Burnetter called 911. Kilburn was treated for the injuries.

The jury found defendant guilty of first degree murder. Defendant filed a motion for a new trial, which the trial court denied.

At the sentencing hearing, Barbara Lantz, Krenzel's mother, read a victim impact statement into the record that included poetry written by Krenzel's daughter. The poetry was read over defendant's objection. After considering the aggravating and mitigating factors, the trial court concluded the crime was exceptionally brutal and heinous and sentenced defendant to an extended term of 70 years in prison. The trial court denied defendant's motion to reconsider his sentence.

## DECISION

### Reasonable Doubt

Defendant first contends the State failed to prove him guilty beyond a reasonable doubt. He claims Kilburn's testimony was incredible because she admitted to having participated in the murder. According to defendant, Kilburn's testimony suggests she acted alone in murdering Krenzel.

■ A reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985). It is not the function of a reviewing court to retry a defendant when it is presented with a challenge to the sufficiency of the evidence. *Collins*, 106 Ill. 2d at 261. The credibility of witnesses and the weight given their testimony are primarily within the province of the fact finder. *Collins*, 106 Ill. 2d at 262.

■ Here, the evidence is sufficient to support the jury's verdict. Kilburn testified defendant hit Krenzel, repeatedly stabbed her, and placed a pillow over her face in an attempt to suffocate her. His knife was recovered from the Arkansas apartment and was found to have traces of blood on it. Dr. Witeck testified Krenzel's wounds could have been inflicted with this knife.

The only evidence defendant presented was Burnetter's testimony that Kilburn threatened him with a knife during an argument. This evidence was related to defendant's theory Kilburn committed the murder in a jealous rage. It in no way establishes defendant did not

participate in the commission of the crime and disposal of Krenzel's body.

Though defendant tried to develop the theory Kilburn acted alone in committing the murders, there was no evidence supporting any explanation for the manner in which Krenzel's murder occurred other than the version presented by Kilburn.

In addition, Kilburn's testimony supports defendant's conviction under an accountability theory. Defendant does not dispute he was present during commission of the crime. Nor does he dispute he and Kilburn brought Krenzel to the apartment. He participated in disposing of Krenzel's body and cleaning the apartment after the murder and fled the state with Kilburn. This is sufficient to support a verdict under an accountability theory. See *People v. Reid*, 136 Ill. 2d 27, 62, 554 N.E.2d 174 (1990) (proof defendant was present during the commission of the crime, maintained a close affiliation with his companions afterward, and failed to report the crime are factors in determining accountability). Though Kilburn's testimony tends to show she was more involved in the commission of the offense than the State initially realized, it in no way negates defendant's participation. Nor does it render her testimony incredible.

## Opening Statement

Defendant next contends he was denied a fair trial because he was precluded from conveying his defense theory during opening statements. He claims the trial court's ruling on one of the State's motions *in limine*, as well as its ruling on several objections made during the course of his attorney's opening statements, served to deny him the opportunity to present his defense theory.

■ A trial court has "great discretion" when defining the allowable scope of opening statements. *People v. Abrams*, 260 Ill. App. 3d 566, 581, 631 N.E.2d 1312 (1994). "A defendant does not establish an abuse of that discretion unless he shows that he was somehow harmed by the court's actions against him." *Abrams*, 260 Ill. App. 3d at 581. To constitute reversible error, an improper interference with an opening statement must have been a material factor in the defendant's conviction. *Abrams*, 260 Ill. App. 3d at 581.

■ At a pretrial conference, the State asked the trial court to preclude discussion of accountability or accomplice allegations in opening statements. Defense counsel responded he should be given "latitude to make any arguments" during opening statements. The trial court found while defense counsel would be allowed to comment on what he expected the evidence to show, he would not "be able to argue anything *** in opening statements, because you're not allowed

to argue in opening statements." Instead of ruling on the motion *in limine*, the trial court decided it would simply "rule on whatever objections are made as they are made."

During defense counsel's opening statement, the trial court sustained only one objection made by the State:

> "This was a crime of rage, of jealousy. We believe the evidence will show that [Kilburn] was furious when [defendant] brought that woman back to her apartment that night.
>
> And the only witness you will hear or see from that stand is [Kilburn] implicating [defendant]. That's it. What does she gain by testifying against Michael?
>
> [Prosecutor]: Objection to argumentative.
>
> THE COURT: Overruled.
>
> [Defense Counsel]: Ladies and gentlemen, she's going to testify in this manner to save her own skin. It's called self-preservation.
>
> [Prosecutor]: Objection, Judge.
>
> THE COURT: Sustained."

We see no reason to say the trial court deprived defendant of the opportunity to present his theory of the case. The trial court simply ruled defense counsel would not be allowed to argue during opening statements. This decision was based on the generally accepted rule that counsel may not argue in opening statements. See T. Mauet, Trial Techniques, at 68 (5th ed. 2000) ("Arguments are reserved for closing arguments. They are improper in opening statements").

Nothing in the record supports defendant's claim that the trial court's rulings represented an abuse of discretion. The trial court allowed defendant to cross-examine Kilburn as to her allegedly "jealous nature," allowed defendant to call Burnetter as a witness to further establish his theory, and gave him a great deal of latitude in arguing this theory during closing arguments. Its refusal to allow him to argue during opening statements was not in error.

## Exclusion of Evidence

■ Defendant also contends the trial court erred in excluding evidence of Kilburn's "incendiary jealous nature" and her "ever-present short fuse." Defendant claims he should have been allowed to cross-examine Kilburn concerning her arrest for telephone harassment of defendant's ex-wife, her alleged threat to kill Burnetter, and her arrest for telephone harassment of Burnetter's first wife.

"While a defendant should be given the widest possible latitude in cross-examining a State's witness, the form that latitude takes rests in the sound discretion of the trial court." *People v. Roy*, 172 Ill. App. 3d 16, 23, 526 N.E.2d 204 (1988). The trial court's decision regarding limitation of cross-examination will not be reversed on appeal absent a

showing of clear abuse of discretion resulting in a manifest prejudice. *Roy*, 172 Ill. App. 3d at 23-24.

Defendant contends Kilburn's arrests for telephone harassment and her threat against Burnetter tend to establish a *modus operandi* which would have supported his theory that she acted alone in committing the acts. He relies on *People v. Lynch*, 104 Ill. 2d 194, 470 N.E.2d 1018 (1984), in which the supreme court found evidence of the victim's prior battery convictions should have been admitted where the defendant alleged self-defense. The *Lynch* court held a victim's aggressive and violent character may support a theory of self-defense where either: (1) the defendant knew of the victim's violent tendencies; or (2) evidence of the victim's propensity for violence supports the defendant's version of the facts where there are conflicting accounts of what happened. *Lynch*, 104 Ill. 2d at 200.

The record indicates the trial court gave defendant a great deal of latitude regarding Kilburn's explosive temper, probably beyond the applicable rules of evidence concerning character of a witness.

Despite defendant's contention to the contrary, the record shows the trial court allowed defendant to question Kilburn about the arrest warrant issued for the alleged telephone harassment of Burnetter's ex-wife. The court at first ruled defendant would not be allowed to cross-examine Kilburn on this issue because defendant could not present any evidence to support his claim that a warrant for her arrest existed. But when defense counsel later showed the court a copy of the arrest warrant, the trial court allowed him to question Kilburn about the warrant.

Though defendant was not allowed to cross-examine Kilburn regarding the incident during which she allegedly threatened Burnetter with a knife, he was allowed to call Burnetter as a witness. Burnetter testified extensively regarding the incident, though Kilburn was never given an opportunity to explain what happened. If anything, the court's ruling was prejudicial to the State rather than defendant, since the State was not given an opportunity to rebut Burnetter's testimony with Kilburn's explanation of the event.

Defendant contends the court's limitation on his cross-examination of Kilburn impeded his ability to establish Kilburn had a motive for testifying falsely. We do not see how evidence of Kilburn's prior behavior would have acted to establish she had a motive to implicate defendant. Defense counsel did ask Kilburn, as well as other witnesses, whether she had been offered leniency in exchange for her testimony. She said she had not been offered any leniency, and Sergeant Schak confirmed Kilburn never was offered leniency.

Defendant was given a great deal of latitude in cross-examining

Kilburn. He asked several questions related to her "jealous nature" and asked if she got angry when other women flirted with defendant.

The trial court's limitation on defendant's cross-examination did not prejudice him or curtail his ability to prove his theory of the case.

## Admissibility of Letters

Though defendant was allowed to ask Kilburn a number of questions relating to cards and letters she sent to defendant after he was incarcerated, the trial court ruled the letters themselves were inadmissible hearsay. Defendant contends the letters were sufficiently trustworthy to warrant their admission into evidence.

■ It is the function of the trial court to determine the admissibility of evidence, and a reviewing court will not reverse the circuit court's ruling absent an abuse of discretion. *People v. Kirchner,* 194 Ill. 2d 502, 539, 743 N.E.2d 94 (2000). Extrajudicial statements may be admissible under the statements-against-penal-interest exception to the hearsay rule. *People v. Carson,* 238 Ill. App. 3d 457, 462, 606 N.E.2d 363 (1992). Such statements are admissible only if they satisfy objective criteria of "trustworthiness." *Carson,* 238 Ill. App. 3d at 462.

■ Though the parties engage in a lengthy analysis of the "trustworthiness" of the letters, we do not believe such an analysis is necessary. The statements made in the letters were ambiguous at best.

Defendant refers to the statements made by Kilburn in letters and cards written to defendant:

> "Why I am [*sic*] not being punished by society as well, why am I financially content?"

> "Thank you for my freedom. I should show you my appreciation more often."

> "I am sorry for the pain [that] I have caused you. I do appreciate the freedom and opportunities you have made available to me. At times, I truly do not know how I am to deal with all of this."

Nothing in these statements can be read as an admission that Kilburn committed the murder.

Defendant was allowed to question Kilburn extensively as to each of these statements during his cross-examination of her. He asked her about the statements, and she admitted to having made them. The jury heard the statements as they were read to Kilburn. The trial court's ruling excluding the letters did not prejudice the defendant.

## Kilburn's Testimony Regarding April 24, 1995, Episode

■ Defendant contends the trial court erred in allowing the State to question Kilburn regarding the April 24, 1995, incident during which her father was injured. At the hearing on defendant's motion for a new trial, the trial court said its decision to allow that testimony

was based on the State's "good faith belief" Kilburn was going to say a baseball bat was used during the murder. The trial court went on to say it found the April 24, 1995, incident relevant because it showed the circumstances surrounding Kilburn and defendant's living situation, the nature of their relationship, and the circumstances that led to their being together on the night of the murder.

We do not find the trial court's ruling to be an abuse of its discretion. Nor do we see that any prejudice resulted from the trial court's decision to allow the testimony. Kilburn testified she picked up the bat and started swinging it at defendant. She said defendant never hit her father and claimed her father was hurt when he fell. This tends to help defendant establish his theory of the case since it shows Kilburn was the aggressor.

### Jury's Questions

The first degree murder definitions instruction and issues instruction indicated the jury could convict defendant if "one for whose conduct he [was] legally responsible" committed the crime.

During its deliberations, the jury sent the following note to the trial court:

> "What constitutes 'legally responsible'? For example, one victim and two people in the room. One person is committing the crime and second person is observing all or part of the crime. Is the second person legally responsible, and can they be charged with the crime and convicted for first degree murder?"

Defense counsel suggested the trial court answer the note by saying a person could not be legally responsible under those circumstances and while they could be charged with a crime, they would not be convicted if the fact finder followed the law. The trial court instead answered by telling the jury, "You have received all of the exhibits and your instructions on the law. Please continue to deliberate."

The jury sent another note to the trial court that asked, "Can we have clarification on aid and abet? If not doing anything at all, is this aiding?" The court answered, "You have received your instructions on the law. Please continue to deliberate." Defense counsel objected and proposed the trial court answer "not doing anything at all" is not "aiding."

Defendant cites *People v. Childs*, 159 Ill. 2d 217, 636 N.E.2d 534 (1994), contending the trial court's answers to the jury's substantive questions requesting clarification of the terms "legally responsible" and "aiding and abetting" were inadequate. He claims the trial court had a duty to explain the substantive law to the jurors where their notes indicated they were confused. According to defendant, where the deliberating jury asks an explicit question requesting clarification on a

legal question arising from instructions, it is reversible error for the judge to refuse to answer those questions.

■ "A trial court may exercise its discretion and properly decline to answer a jury's inquiries where the instructions are readily understandable and sufficiently explain the relevant law, where further instructions would serve no useful purpose or would potentially mislead the jury, when the jury's inquiry involves a question of fact, or if the giving of an answer would cause the court to express an opinion which would likely direct a verdict one way or another." *Childs*, 159 Ill. 2d at 228.

In *Childs*, defendant was convicted of armed robbery and murder. During its deliberations, the jury sent a note to the trial court that asked, "Can the defendant be guilty of armed robbery and voluntary or involuntary manslaughter or must murder be the only option with armed robbery?" 159 Ill. 2d at 225. The trial judge responded, "You have received your instructions as to the law, read them and continue to deliberate." 159 Ill. 2d at 225. The supreme court found the response to the jury's note inadequate and said:

> "The jury posed an explicit question regarding what the State concedes is an 'intricate' and 'difficult' point of law, and which other cases suggest is not an uncommon source of juror confusion. *** It is not apparent to us that the manner in which the court dealt with the jury's inquiry was not a factor in the rendering of that verdict." *Childs*, 159 Ill. 2d at 234.

The *Childs* jury asked a question that did not require the trial court to comment on the facts of the case or to express an opinion that would be likely to direct the verdict one way or another.

■ Here, both questions defendant complains about included factual hypotheticals. Any commentary on these questions would have had the effect of commenting on the facts of the case. *People v. Reid*, 136 Ill. 2d 27, 39, 554 N.E.2d 174 (1990); *People v. Tostado*, 92 Ill. App. 3d 837, 839, 416 N.E.2d 353 (1981).

In *Tostado*, the appellate court found the trial court's refusal to answer a question from the jury regarding the identity of the victim was not erroneous where doing so might require it to discuss the facts and express an opinion on the evidence. *Tostado*, 92 Ill. App. 3d at 839.

Here, as in *Tostado*, an answer to the jury's questions and hypotheticals would have required the court to indirectly comment on the facts and evidence. Its answers to the questions were appropriate.

### Victim Impact Statement

■ Defendant appeals his sentence, contending the trial court erred in allowing the victim's mother to read a victim impact state-

ment that included poetry written by one of the victim's daughters. According to defendant, this had the effect of allowing two victim impact statements to be read into the record. He cites no case law to support his argument.

Nothing in any case law or statute that we are aware of precludes a victim from including poetry in a victim impact statement. See 725 ILCS 120/6 (West 1998). The trial court may consider statements from more than one source. *People v. Gonzales*, 285 Ill. App. 3d 102, 104, 673 N.E.2d 1181 (1996). We therefore find defendant's argument is without merit.

### *Apprendi* Issue

In a supplemental brief, defendant contends the trial court's imposition of an extended sentence under section 5—5—3.2(b)(2) of the Unified Code of Corrections (730 ILCS 5/5—5—3.2(b)(2) (West 1992)) should be vacated in accordance with *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). In *Apprendi*, the United States Supreme Court held any fact, other than a prior conviction, that increases the maximum penalty for a crime must be submitted to a fact finder and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63. Here, the question of whether the crime was committed in a brutal and heinous manner, indicative of wanton cruelty, was not submitted to a fact finder and proved beyond a reasonable doubt as required by *Apprendi*.

The State contends the 70-year sentence is not beyond the maximum penalty for murder in Illinois because the range of sentencing for first degree murder is from 20 years in prison up to and including the death penalty. Thus, says the State, *Apprendi* is not implicated. We disagree.

We rejected this argument in *People v. Lee*, 318 Ill. App. 3d 417, 421-22, 743 N.E.2d 1019 (2000). In that case, we held that the statutory sentencing range for first degree murder is 20 to 60 years' imprisonment, *not* 20 years' imprisonment up to and including the death penalty. *Lee*, 318 Ill. App. 3d at 422, citing 730 ILCS 5/5—8—1(a)(1)(a) (West 1992); see also *People v. Swift*, 202 Ill. 2d 378, 392, 781 N.E.2d 292 (2002) (holding the sentencing range for first degree murder is 20 to 60 years; any factual findings that increase a sentence above that range must be proven to a jury beyond a reasonable doubt). The defendant was sentenced to natural life imprisonment for first degree murder, which exceeded the statutory range. *Lee*, 318 Ill. App. 3d at 422. Because the extended-term sentence was based on the court's finding that the crime was exceptionally brutal and heinous

without submitting the issue to a jury or requiring proof beyond a reasonable doubt, the imposition of the sentence was error. *Lee*, 318 Ill. App. 3d at 422-23.

We make the same finding here.

The State contends the defendant forfeited our review of this issue because he failed to raise the issue before the trial court. The State says, under *People v. Crespo*, 203 Ill. 2d 335, 788 N.E.2d 1117 (2001), any error made in imposing the extended-term sentence in this case is not plain error because defendant cannot show prejudice. We agree.

In *Crespo*, the defendant challenged his extended-term sentence of 75 years' imprisonment based on *Apprendi*. He contended his sentence was based on a finding of brutal and heinous conduct that should have been submitted to a finder of fact and proved beyond a reasonable doubt. Although the State conceded error, it contended the error was harmless.

In a supplemental opinion, the supreme court said the proper analysis in that case was whether the *Apprendi* violation was plain error because the defendant failed to object at the trial court level. *Crespo*, 203 Ill. 2d at 347. For the court to consider an issue that was not properly preserved under a plain error analysis, (1) error must exist, (2) the error must be "plain," and (3) the error must affect the defendant's substantial rights. *Crespo*, 203 Ill. 2d at 348, quoting *United States v. Cotton*, 535 U.S. 625, 631, 152 L. Ed. 2d 860, 868, 122 S. Ct. 1781, 1785 (2002). Even then, the appellate court may exercise its discretion to address a forfeited error only where the error " ' "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." ' [Citation.]" *Crespo*, 203 Ill. 2d at 348. The supreme court said that under the plain error analysis, the sentence should be affirmed unless the defendant showed the error was prejudicial. *Crespo*, 203 Ill. 2d at 347-48.

The court applied the plan error analysis to the facts before it. The evidence showed the defendant stabbed the victim 24 times and with sufficient force to bend the knife blade. He also pulled her hair so hard that he ripped out a large clump of it with scalp still attached. Considering the evidence, the court concluded the sentencing error did not affect the fairness, integrity, or public reputation of judicial proceedings. *Crespo*, 203 Ill. 2d at 349. Because the defendant failed to show the error was prejudicial, the supreme court affirmed the extended-term sentence. *Crespo*, 203 Ill. 2d at 349.

The evidence presented to the trial court in this case overwhelmingly supported a finding that the crime was committed in a brutal and heinous manner, indicative of wanton cruelty. Defendant and his wife brought Krenzel to their home. Defendant beat her and

stuck the knife in her throat. He and his wife then smothered Krenzel. Defendant and his wife repeatedly stabbed Krenzel, even after she stopped struggling. Forensic evidence at trial establish some of Krenzel's stab wounds were inflicted after she died and one of the stab wounds was to her eye. If these facts were submitted to a jury, we are certain the jury would have found defendant committed this murder in a brutal and heinous manner, indicative of wanton cruelty. Defendant has failed to show the sentencing error was prejudicial.

CONCLUSION

For the reasons discussed above, we affirm defendant's conviction and sentence.

Affirmed.

BURKE and HOFFMAN, JJ., concur.