No. 2--04--0487                                   filed:9/28/06

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 02--CF--1861 |
| TYJUAN T. ANDERSON, | ) ) ) | Honorable Gerald F. Grubb, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BYRNE delivered the opinion of the court:

At 2:51 a.m. on April 14, 2002, Estella Dowthard called 911 to report that someone had just fired four shots through a bedroom window of her home. The shots were intended for Alex Dowthard, Estella's son. Instead, eight-year-old DeMarcus Hanson, Estella's grandson and Alex's nephew, was shot in the head and killed. A jury found defendant, Tyjuan T. Anderson, guilty of the first-degree murder of DeMarcus (see 720 ILCS 5/9--1(a)(2) (West 2004)), and the trial court imposed a 50-year prison term. Defendant appeals, arguing that (1) he is entitled to a new trial because the trial court committed reversible error in excluding three extrajudicial declarations that someone other than

defendant committed the offense and (2) the State did not prove him guilty beyond a reasonable doubt.

We hold that the trial court did not abuse its discretion in excluding the three extrajudicial declarations of third-party guilt and that defendant was proved guilty beyond a reasonable doubt of first-degree murder. Therefore, we affirm the judgment.

BACKGROUND

In accordance with the guilty verdict, the trial court entered judgment on count III of the indictment. Count III alleged that, on April 14, 2002, defendant committed first-degree murder in that he, "without lawful justification, shot DeMarcus Hanson in the head with a firearm, knowing such act created a strong probability of death or great bodily harm to DeMarcus Hanson or another, thereby causing the death of DeMarcus Hanson." See 720 ILCS 5/9--1(a)(2) (West 2004).

Certain facts are undisputed. Alex Dowthard was a member of the Gangster Disciples street gang, and his friend, Lataurean Brown, was a member of the Vice Lords. On the night of the incident, Alex and Lataurean exchanged insults with and shot at Lumont Johnson, Anthony Ross, and defendant, who are members of the rival Black P. Stones gang. The State's theory of the case is that defendant, accompanied by Lumont and Anthony, borrowed Casel Montgomery's red car, drove to the Dowthard home, and fired shots into DeMarcus's bedroom in retaliation, thinking that Alex was hiding inside. Defendant presented an alibi defense, in support of which his family members testified that he and Lumont were at the home of defendant's aunt, Mary Joyce Anderson, at the time of the shooting. Further, defendant argued that Casel Montgomery and Kefentse Taylor were

actually the offenders and that they had made inculpatory statements to that effect after the crime.

Initially, defendant was to be tried with codefendants Lumont and Anthony. Defendant moved for a separate trial, and the trial court severed Anthony's case. However, the court ruled that defendant and Lumont would be tried together, and defendant does not challenge that ruling on appeal.

Before trial, the State moved in limine to exclude three extrajudicial declarations made by Casel and Kefentse. Defendant argued that the statements of third-party guilt were reliable and probative and therefore admissible to exculpate him. The statements are as follows. First, Martin Love would testify that, sometime after defendant, Lumont, and Anthony were arrested, Martin and Kefentse had a conversation about Kefentse's rumored cooperation with the police, and Kefentse admitted that he had "shot shortie." Second, Lumont, the codefendant, would testify that, on the morning after the shooting, Kefentse sought him out and said that he had "got at" Alex. Third, Dennis Mackey, a jailhouse informant, would testify that Casel confessed several weeks after the incident that he and Kefentse had driven the red car spotted at the scene, parked it a block from the house, walked through several backyards, and shot through the window of the house.

The court preliminarily excluded all three declarations, ruling that counsel could not mention them during opening statements because "there are some factors that are missing in the analysis that make it questionable as to [their] reliability." However, the court stated that defendant could revisit the issue upon introducing evidence that corroborated the declarations.

At trial, Estella Dowthard testified that she resided on Chestnut Street in Rockford. Just before the shooting, she was on her living room sofa, watching television. She turned off the television and heard a gunshot near her driveway, but she did not hear anything hit the house. She crawled 20 feet to DeMarcus's room, where she heard gunshots through the bedroom window. Estella discovered that DeMarcus was bleeding, and she crawled back to the living room, where she called 911. Estella estimated that three minutes passed between the time DeMarcus was shot and the time she called. The 911 telephone system records indicate that Estella called at 2:51 a.m., but a 911 operator testified that the time stamp could be inaccurate by up to three minutes.

Estella's next-door neighbor, Deshawanda Woods, corroborated Estella's estimate of the time of the fatal gunshots, testifying that her watch read 2:50 a.m. when she heard gunshots outside her house. However, Erica McCord, who lived near the scene, testified that her digital clock read 2:36 or 2:38 a.m. when she heard the gunshots. Upon hearing the shots, Erica walked through her screened front porch, and when she reached the front door, she saw a red Grand Am drive past her house.

### A. Alex Dowthard

Alex Dowthard testified that he was staying at Estella's home three days per week around the time of the shooting. During the hours preceding the shooting, Alex was riding as the only passenger of his Monte Carlo, while his friend, Lataurean Brown, drove. They drove to a nightclub and talked to some people as they sat in the car. Lataurean and Alex then drove to a liquor store and parked in the lot. Alex sat on the car's hood. Alex saw Lumont drive up in his Suburban with defendant, Anthony, and an unknown person as passengers. Defendant rolled down the backseat window and called to Alex. The two

exchanged disrespectful hand gestures and defendant called Alex a "bitch." Anthony leaned out of his open door to say something, and the Suburban drove away.

Alex testified that he and Lataurean then drove to the M&M Market, where they saw defendant, Lumont, and Anthony. Alex and Anthony exchanged more insults. Five minutes later, Alex and Lataurean departed for Catfish City. Along the way, Alex saw the Suburban on Tay Street. Alex grabbed his gun, rose through the T-top of the Monte Carlo, and fired three or four shots at the Suburban, trying to strike the occupants. Alex reloaded his revolver, and when the Monte Carlo turned the corner, Alex saw the Suburban and fired more shots at it. Alex told Lataurean that they needed to get out of the Monte Carlo and find another car. They searched for 10 to 15 minutes but could not find one.

Alex testified that, after he fired the shots, he told Lataurean to drive to Estella's house so Alex could hide the gun. They parked in front of the house, and Alex placed the gun behind the wheel of another car that was in his mother's driveway. When Alex walked back down the driveway, he saw a red car pull up next to the Monte Carlo. Defendant, Lumont, and Anthony exited the red car and started running toward Alex. Lumont and Anthony each carried a chrome handgun, and Alex heard someone yell, "cut him off." Alex ran up the driveway and through his mother's backyard before hiding behind the garage. Lumont and Anthony had run down the other side of the house to cut him off. About 20 seconds later and while kneeling behind the garage, Alex heard four of five gunshots in a row. Alex waited 15 seconds and walked to the front of the garage to investigate. Alex saw Lumont and Anthony running toward the red car. Alex and Lataurean then drove to Concord Commons.

Alex testified that, later that morning, he learned that DeMarcus had been shot and killed the night before. Alex did not contact the police immediately, because he was on parole. He asked his girlfriend, Janeica Blankenship, to falsely tell the police that he had been with her on the night of the killing. Alex and his uncle went to the police station, and Alex said that he had spent the night with Janeica and did not know who was responsible for killing DeMarcus. Alex admitted to possessing a gun only after the police threatened to test him for gun powder residue. Alex admitted that he hid his gun under the car in his mother's driveway. The police held Alex at Big Muddy Correctional Center (Big Muddy) for a suspected parole violation. Alex refused further discussion with the police at that time.

Detective James Randall testified that, during the April 14, 2002, interview, he told Alex that he must cooperate because the investigation involved the death of his nephew. Alex replied, "Oh well, we all gotta go sometime."

While incarcerated at Big Muddy, Alex was charged with committing a forgery unrelated to this case. Alex testified that he told the police that he would speak about DeMarcus's killing only if they promised to inform the parole board and the Winnebago County State's Attorney that he had cooperated. The interviewing detectives said they would inform the parole board and the State's Attorney of Alex's help, but they did not "make any promises."

Detective Joseph Stevens testified that, during an interview, Alex said that he did not hear the gunshots that killed DeMarcus. On May 2, 2002, Detective Stevens and Detective Douglas Palmer spoke with Alex at Big Muddy, where he said, "I'll do my time and get out. I'll see the [parole] board next month. This shit doesn't matter to me."

On May 31, 2002, Alex provided a written statement that for the first time identified defendant, Lumont, and Anthony as the assailants. Alex did not confess to shooting at the Suburban. The writing states, "[A]s I ran by the garage, which is located behind my mother's house, I heard four to five gunshots." At trial, Alex admitted that his statement lacks reference to him hiding behind the garage or to the timing of the gunshots. He testified that he did not include the additional details "[b]ecause that's what--you know, I just told them to put that down." He insisted that he told the truth on May 31, 2002, because it was the right thing to do. Alex also testified that the State had not offered him leniency in exchange for his testimony. However, after he testified before the grand jury, Alex's forgery charge was dismissed and he was not charged with any offense connected to the discharge of his firearm on the night of DeMarcus's death. Alex originally wanted to "handle this himself," but he now wished to see defendant and Lumont imprisoned.

Detective Greg Lindmark generally corroborated Alex's summary of the May 31, 2002, interview at Big Muddy. However, according to Detective Lindmark, Alex threatened to commit perjury before the grand jury if he was not transferred from Big Muddy to the Winnebago County jail.

### B. Lataurean Brown

Lataurean Brown also testified for the State. At the time of the incident, Lataurean was a member of the Vice Lords gang and had known Alex for three months. Lataurean said he did not know whether Alex was a member of a gang. Lataurean knew defendant and Lumont. Generally, Lataurean corroborated Alex's testimony regarding the initial confrontation between the occupants of the vehicles.

Lataurean further testified that, after Alex fired from the T-top of the Monte Carlo, Alex directed him to drive to Estella's house. According to Lataurean, he curbed the car in front of the house (on the wrong side of the street) and kept the engine running. Alex exited the vehicle, walked up the driveway, placed his gun under the gray Ford Taurus in Estella's driveway, and walked back toward the Monte Carlo. Alex said, "Oh shit, here come them niggers" and ran toward the house. Lataurean looked to his right and saw defendant, Lumont, and Anthony in a red car. Lataurean drove away in the Monte Carlo, and in his rearview mirror, he saw defendant and Anthony running after Alex. Lataurean eventually stopped the car and saw Alex running toward him. Lataurean heard four gunshots as Alex reached the intersection of Chestnut and Henrietta Streets. Alex entered the Monte Carlo, and Lataurean drove to Concord Commons. Lataurean did not learn that DeMarcus had been killed until later that morning.

Ten days after the April 14, 2002, incident, Lataurean spoke to the police at his cousin's house and also at the public safety building. At trial, Lataurean admitted to initially lying to the police. Lataurean disclosed that Alex shot at the Suburban but he did not say who had shot at the house in retaliation. In May 2002, Lataurean finally told the police that defendant, Lumont, and Anthony were responsible for DeMarcus's death. Detective Palmer testified that, during the May 2002 interview, Lataurean never said that he was present when the shots were fired into DeMarcus's bedroom.

At trial, Lataurean recalled that Alex was the only person to display gang signs at the liquor store and that the first thing defendant said was to call Alex a "bitch mother fucker." However, this testimony contradicted Lataurean's prior written statement, in which he reported that the first thing defendant said was, "what does that mean?"

### C. Forensic Evidence and Police Interviews

Police officers and detectives testified that two spent bullet slugs, which were recovered near DeMarcus's home, were tested and found to have been fired from Alex's gun, which had been recovered from his mother's driveway. Four bullet casings that were found outside DeMarcus's bedroom window, and three of the four bullet slugs that entered DeMarcus's bedroom, were tested. None matched Alex's gun. When Lumont was arrested, a gun with his fingerprints was discovered in his bedroom. None of the bullet casings or slugs matched Lumont's gun. In short, the State did not identify or produce the weapon that killed DeMarcus.

Detective Torry Regez testified that he interviewed defendant at the public safety building after he and his mother, Jackwalon Anderson, arrived at 7 p.m. on the evening following the incident. Defendant's story evolved over the course of the interview. Initially, defendant told Detective Regez that, the night before, he was at home and called Anthony to pick him up. Defendant and Anthony went to a party where they met Lumont and Javarus Williams. They all went to a nightclub and then drove past the liquor store, in Lumont's Suburban. Defendant and Lumont dropped Anthony and Javarus off and returned to defendant's house. Lumont went inside, used defendant's phone, and left. During the initial interview, defendant denied having any contact with Alex, and he denied knowing who Alex was or what he looked like.

Detective Regez testified that he left the interview room and spoke with other detectives who had obtained additional details that indicated defendant's story was incomplete. Detective Regez confronted defendant with the information that Anthony had parked his car on Chestnut Street, the group met Anthony's girlfriend at the liquor store to

help her with a "traffic problem," and the group went to Catfish City before dropping off Javarus. Defendant agreed that these details were true, and he explained that he omitted them because they were unimportant. Defendant twice reiterated his denial of having "any trouble" with Alex that night.

Detective Regez asked defendant to restate his account of the events, and defendant provided some additional details. Defendant now admitted seeing Lataurean standing next to a purple Monte Carlo at the liquor store and flashing the Vice Lords gang sign. Defendant denied seeing Alex at the liquor store. Defendant also stated that, as he and Lumont were driving down Tay Street, he heard three gunshots fired from an unidentified source.

Detective Regez left the interview room again momentarily, and upon returning with new information, defendant admitted that he was familiar with Alex and knew he drove a purple Monte Carlo. Defendant finally acknowledged seeing Alex stand through the T-top and fire toward the Suburban. Defendant stated that, after Alex shot at the Suburban, Lumont and defendant drove straight to defendant's house. Defendant's mother and his girlfriend, Ashley Smart, were there and awake. The next morning, Ashley told defendant that DeMarcus had been killed. At that time, defendant concluded that DeMarcus had been killed before Alex shot at them and that Alex's attack was retaliation under the mistaken belief that defendant and his friends were responsible for DeMarcus's death.

Detective Stevens testified that he interviewed defendant on July 2, 2002, which was more than two months after the incident. According to Detective Stevens, defendant's account of the events was substantially similar to the final version he had given Detective Regez. Defendant told Detective Stevens that, after the group drove past the liquor store,

Lumont and defendant dropped Anthony off at his car and then dropped Javarus off at his house.  Defendant and Lumont drove toward Catfish City and saw the Monte Carlo drive past them in the opposite direction.  After the Monte Carlo passed, Lumont asked defendant whether he "heard that."  Defendant did not know what Lumont meant because he did not hear the gunshots over the Suburban's stereo.  Lumont turned onto Chestnut Street and met Anthony.  Anthony told Lumont that he did not hear gunshots either.  Lumont and defendant drove to defendant's house, and defendant recalled that they arrived no later than 2 a.m.  Defendant's aunt, Mary Joyce Anderson, let defendant and Lumont into the home.  Within three minutes, Lumont used the home phone to call Sharnetta Dickens.  Twenty minutes later, Lumont left and defendant went to bed with his girlfriend, Ashley.

Detective Randall testified that he also interviewed defendant on July 2, 2002.  Defendant's story was again substantially similar to the version he told to Detectives Regez and Stevens.  However, defendant's story varied somewhat when he told Detective Randall that he saw Alex in the liquor store parking lot.

Police officer Brad Larson testified that he was on duty when defendant and his brother, Terrence Anderson, were being held in adjacent cells following the crime.  Officer Larson overheard Terrence instruct defendant not to say anything to the police.  Officer Larson heard defendant respond, "It's okay man.  I'll just do the 20 years and be out."  At trial, Terrence denied the conversation.

Tameka Smith, who was pregnant with Alex's child, testified that she and defendant's girlfriend, Ashley, were cousins and had lived together before the incident.  Tameka testified that, on the day after DeMarcus's death, Ashley was visiting her home.  Defendant

called and asked to speak with Ashley, but she did not answer the call, because she was using the bathroom.

### D. Lumont Johnson

Lumont Johnson testified for the defense. For the most part, his testimony corroborated the final version of the story defendant gave to the detectives. Lumont testified that, during the late evening hours preceding the incident, he was driving his Suburban with defendant and Javarus, and they met up with Anthony, who was driving his black Cadillac. Anthony agreed to accompany Lumont, Javarus, and defendant to the nightclub, in Lumont's Suburban. Anthony left his Cadillac at a friend's address. The group drove to the liquor store, where they purchased and consumed alcohol before driving to the nightclub. Lumont and Anthony entered the nightclub at 11 p.m. and stayed inside until it closed at 1:45 a.m. Defendant and Javarus remained in the parking lot because they were underage.

Lumont testified that he, Anthony, Javarus, and defendant returned to the liquor store and saw Alex and Lataurean near the Monte Carlo. Lumont stopped the Suburban for traffic, and he saw Alex display a gang sign. Defendant asked "what that was about." Lumont dropped Anthony off at his Cadillac near the intersection of Tay and Chestnut Streets and then dropped Javarus off at his house on Albert Street. Lumont and defendant remained in the Suburban, drove past Catfish City, and eventually saw Anthony driving his Cadillac.

Lumont and defendant, who were in the Suburban, followed Anthony, who was in the Cadillac. The two vehicles encountered the Monte Carlo at the intersection of Tay and Chestnut Streets. The Monte Carlo paused at the stop sign and turned toward the Suburban. Lumont heard gunshots, turned onto Chestnut Street, and parked near

Anthony, who had also stopped. Lumont recognized the Monte Carlo but did not see the driver or the shooter.

Lumont testified that he exited the Suburban, checked it for bullet holes, and did not find any. Casel Montgomery pulled up in a red Grand Am or Grand Prix and parked behind the Suburban. Lumont asked Anthony whether he heard gunshots, and Anthony answered "no." Lumont and defendant drove to defendant's house on North Rockton. Anthony and Casel remained on Chestnut Street.

Lumont testified that, when he and defendant arrived at defendant's house, they tossed rocks at a window to wake defendant's aunt, Mary Joyce. Jackwalon Anderson, defendant's mother, and Shirella Anderson, his 16-year-old sister, each testified to being in the home when defendant and Lumont arrived. Jackwalon recalled that they arrived between 2 and 2:30 a.m. Shirella stated that she came home at 2 or 2:15 a.m. and that defendant and Lumont arrived about 10 minutes later. Jackwalon testified that Mary Joyce opened the door for defendant and Lumont.

Lumont testified that, upon entering the house, he spoke with Mary Joyce for a few moments and used the telephone to call Sharnetta Dickens. Lumont placed several calls to Sharnetta, but she did not answer. Jackwalon also testified to Lumont's calls, and Sharnetta testified that her telephone number was the same as the one Lumont testified to calling.

Lumont testified that he spent a few more minutes at the house before visiting the homes of Jamila Baker and Candi Patterson. Lumont testified that he slept at Candi's house, and D'Angelo Patterson and Regina Suggs, residents of the home, corroborated this assertion.

The next day, Lumont went to a friend's home, where he learned that a police officer was looking for him. Lumont called the officer, went to the public safety building, and spoke with the police that day and the next.

Stephen Jackson, a car rental manager, testified that, three days before the incident, he rented a red Pontiac Grand Prix to Tishekia Barmore, whom Lumont identified as Casel Montgomery's girlfriend. The car was to be rented through April 18, 2002, but Tishekia returned it three days early and rented a Ford Taurus.

Linda Thomas, an asset protection manager of SBC, testified to her company's records of the telephone calls originating from the line at defendant's house. A call to "time-and-temperature" was made at 2:32 a.m. Also, calls to Shernetta Dickens' home were made at 2:47, 2:48, 2:49, 2:50, 2:53, 2:54, and 2:55 a.m.

A public defender investigator testified that a person could drive the 1.9 to 2.0 miles between the homes of defendant and DeMarcus in about four minutes without breaking any traffic laws.

The jury found defendant guilty on all counts, and the trial court entered judgment on count III. Defendant unsuccessfully moved for a new trial, and the court imposed a 50-year prison term. This timely appeal followed.

ANALYSIS

On appeal, defendant argues that he is entitled to a new trial because the trial court committed reversible error in excluding the extrajudicial declarations of the third-party guilt of Kefentse Taylor and Casel Montgomery. Defendant also challenges the sufficiency of the evidence. If we were deciding this issue for the first time in the trial court, we most likely would have admitted Kefentse's statements to Martin Love and codefendant Lumont

Johnson.  Many other judges likely would have also ruled the same way.  However, at this stage in the case, the standard of appellate review--abuse of discretion--compels us to defer to the trial court's judgment and affirm the exclusion of the declarations.  We further conclude that defendant was proved guilty of first-degree murder beyond a reasonable doubt.

A. Admissibility of Extrajudicial Declarations of Third-Party Guilt

Initially, we address defendant's challenge to the trial court's decision to bar the out-of-court statements made by Kefentse Taylor and Casel Montgomery.  The admission of evidence is within the sound discretion of the trial court, whose judgment should not be reversed absent a clear showing of an abuse of discretion.  People v. Tenney, 205 Ill. 2d 411, 436 (2002); People v. Bowel, 111 Ill. 2d 58, 68 (1986).  " 'Abuse of discretion' is the most deferential standard of review--next to no review at all--and is therefore traditionally reserved for decisions made by a trial judge in overseeing his or her courtroom or in maintaining the progress of a trial."  In re D.T., 212 Ill. 2d 347, 356 (2004), quoting People v. Coleman, 183 Ill. 2d 366, 387 (1998).  A trial court abuses its discretion only when its ruling is " ' "arbitrary, fanciful or unreasonable" ' or ' "where no reasonable man would take the view adopted by the trial court." ' "  People v. Donoho, 204 Ill. 2d 159, 182 (2003), quoting People v. M.D., 101 Ill. 2d 73, 90 (1984) (Simon, J., dissenting), quoting Peek v. United States, 321 F. 2d 934, 942 (9th Cir.1963).

"Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted, and is generally inadmissible unless it falls within an exception."  People v. Lawler, 142 Ill. 2d 548, 557 (1991).  Hearsay evidence is generally inadmissible because of the lack of an opportunity to cross-examine the declarant.  People v. Jura, 352 Ill. App. 3d

1080, 1085 (2004). "Generally an extrajudicial declaration not under oath, by the declarant, that he, and not the defendant on trial, committed the crime is inadmissible as hearsay though the declaration is against the declarant's penal interest." Bowel, 111 Ill. 2d at 66, citing People v. Tate, 87 Ill. 2d 134, 143 (1981). However, extrajudicial statements may be admissible under the statements-against-penal-interest exception to the hearsay rule if they satisfy objective criteria of trustworthiness. People v. Lee, 342 Ill. App. 3d 37, 53 (2003).

Illinois courts follow the approach set forth in Chambers v. Mississippi, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973), where the United States Supreme Court held that a declaration against penal interest is admissible where there are sufficient indicia of trustworthiness in that (1) the statement was made spontaneously to a close acquaintance shortly after the crime occurred; (2) the statement was corroborated by other evidence; (3) the statement was self-incriminating and against the declarant's interest; and (4) there was adequate opportunity for cross-examination of the declarant. Chambers, 410 U.S. at 300-01, 35 L. Ed. 2d at 312, 93 S. Ct. at 1048-49. A court should use these four factors to determine whether the declaration was made under circumstances that considerably assure reliability by "objective indicia of trustworthiness," rather than use them as requirements of admissibility. Bowel, 111 Ill. 2d at 67, citing Chambers, 410 U.S. at 300-01, 35 L. Ed. 2d at 312, 93 S. Ct. at 1048-49. Just as all four factors are not necessary to establish a statement's trustworthiness, the existence of one or more of the factors is not necessarily sufficient to establish a statement's trustworthiness. People v. Gallano, 354 Ill. App. 3d 941, 957 (2004). The trial court must ultimately determine whether the totality of the circumstances makes the hearsay statement trustworthy. Gallano, 354 Ill. App. 3d at

957.  Mindful of these principles, we review the admissibility of the three extrajudicial declarations that the trial court excluded in this case.

### 1. Kefentse Taylor's Statements to Martin Love

The State moved to bar any reference to Kefentse Taylor's statements to Martin Love.  The State's motion in limine alleged that the statements are hearsay.  On July 19, 2002, Martin was arrested for an offense unrelated to this case.  According to the State, Martin was interviewed by (1) the Rockford city police on July 29, 2002, (2) the Winnebago County public defender's office on August 23, 2002, and (3) the Rockford city police on October 16, 2002.  The motion asserts that written summaries of all three interviews were prepared at the time they were held.  However, only two pages of one report of the July 29, 2002, meeting are contained in the record.

The report indicates that, on July 29, 2002, which was 108 days after the incident, Martin was incarcerated in the Winnebago County jail and asked to speak with an unnamed Rockford police detective about "an important matter."  Martin was transported to the Rockford police station, where he told the detective that he was a member of the Black P. Stones street gang and had been "working dope" with Kefentse for about a month before Martin was incarcerated.  Martin said that "the word out on the street was Kefentse was snitching" and was working for the police.

Martin told the detective that "one day" he called Kefentse and they went for a 10-minute car ride, during which Kefentse seemed paranoid.  During the ride, Martin remarked, "[I]t's crazy as hell out here," and Kefentse responded with a strange look and asked, "[W]hat's this about people saying I am the police?"  Martin did not respond.  Kefentse then said, "[W]hen them statement come out people will see I ain't the police."

Kefentse said that Lumont had called him on the night of the shooting, and Kefentse agreed to meet Lumont at the house "to see what was up." Kefentse told Martin, "I'm the one who killed that shortie," and Kefentse repeated "I did that" about four times.

The defense revisited the issue at trial and presented Martin's testimony as an offer of proof. Martin, who was 19 years old at the time of the trial, testified to the conversation with Kefentse about DeMarcus's death, but Martin could not recall the date. Martin recalled only that he spoke with Kefentse "a little bit" after defendant, Lumont, and Anthony were arrested. Martin and Kefentse discussed the incident, during the car ride mentioned in the police report. Martin testified that the word on the street was that Kefentse had signed a statement indicating that defendant, Lumont, and Anthony had committed the murder. Kefentse responded by questioning rhetorically, "What am I gonna tell on them niggas for when I'm the one that killed shortie?" Kefentse also said that no one would suspect that he was working for the police when "them statements come out at the end of the month." Martin testified that Kefentse stated three times that he was responsible for DeMarcus's death. Kefentse used the terms "killed" and "shot" interchangeably.

On cross-examination, Martin acknowledged an interview he had with Detective Bradley Stallings on August 23, 2002. The interview focused on Martin's conversation with Kefentse, and Detective Stallings prepared a report indicating that Kefentse admitted that he "shot" DeMarcus. Martin acknowledged that the report did not indicate that Kefentse used the term "killed," and that the report was probably an accurate summary of the interview and his conversation with Kefentse.

In our view, it is a close issue whether the trial court's decision to exclude Kefentse's statements to Martin was "fanciful, arbitrary, or unreasonable to the degree that no

reasonable person would agree with it." People v. Ortega, 209 Ill. 2d 354, 359 (2004). We conclude that the trial court did not abuse its discretion. First, Martin's testimony showed that Kefentse spontaneously admitted to shooting DeMarcus. The statements were made in the course of a casual conversation regarding Kefentse's rumored cooperation with the police and were not elicited through probing questioning. Kefentse, not Martin, raised the issue of DeMarcus's murder. Also, if Kefentse felt comfortable enough with Martin to engage in the illegal endeavor of drug dealing, he likely viewed Martin as a close acquaintance to whom he could confess his involvement in the murder. However, the timing of the conversation undermines its reliability. DeMarcus was killed on April 14, 2002, and Martin testified that the conversation occurred sometime during the month before Martin's incarceration on July 19, 2002. Thus, the statements would have been made two to three months after the incident. The timing of the alleged statements weighs against their admission.

Second, Kefentse's inculpatory statements were consistent with defendant's alibi, but no evidence actually corroborated Kefentse's declaration that he and not defendant committed the offense. Defendant's family testified to the arrival of defendant and Lumont at defendant's home about 20 minutes before the shooting. Phone records show that several calls originating from the home were placed to Lumont's girlfriend precisely at the time of the murder. However, there was no evidence of Kefentse's presence at the scene on the night of the shooting. Lumont testified to seeing the red car, which was rented by Casel's girlfriend, at the intersection of Tay and Chestnut Streets a few minutes before the shooting. Also, a disinterested neighbor testified to seeing a red car, which resembled the one rented by Casel's girlfriend, drive past her house immediately after shots were fired into

DeMarcus's bedroom. However, Lumont testified that only Casel was in the car, and he did not mention seeing Kefentse at all on the night of the incident. Defendant's alibi suggests that someone else committed the offense, but there was no independent evidence to identify Kefentse as the offender. The absence of corroborating evidence of Kefentse's commission of the crime is a factor weighing against the admission of the statements.

Third, the statements were against Kefentse's penal interest, and he repeated the admission at least three times during the 10-minute conversation with Martin so that the statement could not be misconstrued. Fourth, Kefentse was incarcerated at the time of defendant's trial, and therefore, he could have been subpoenaed for cross-examination. In fact, Kefentse might have been a part of the investigation, but the exclusion of his statements to Martin prevented inquiry into this possibility. These facts support admission of the statements.

The totality of the circumstances determines a statement's trustworthiness under Chambers, and the absence of one factor does not automatically render the statement unreliable. However, in light of our deferential abuse-of-discretion standard of review for evidentiary issues, we conclude that the totality of the circumstances shows that the trial court did not abuse its discretion. The decision to exclude Kefentse's statements to Martin was not "fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." See Ortega, 209 Ill. 2d at 359. The trial court implicitly determined that the remoteness of the conversation or the absence of corroborating evidence outweighed the spontaneity and clarity of Kefentse's statements against penal interest. While other judges might have decided the issue differently, we conclude that the trial court did not abuse its discretion in this case.

## 2. Kefentse Taylor's Statements to Codefendant Lumont Johnson

In another motion in limine, the State moved to exclude Kefentse Taylor's statements to Lumont Johnson. According to the motion, Lumont would attempt to testify that Kefentse told him, "I already got at him" or "I got at somebody for that." Out of the presence of the jury, the defense presented Lumont's testimony as an offer of proof. Lumont testified that, on the morning of April 14, 2002, he was outside Jamila Baker's house, taking care of his dogs. Kefentse pulled up and spoke with Lumont about the confrontation with Alex and Latuarean that had occurred the previous night.

Lumont stated that Kefentse "just asked me 'was I cool,' and I was like 'yeah.' Then he asked me--he walked around my truck, looked at my truck. I was like 'I don't think [Alex] shot at me.' He was like 'Well, we got at him last night anyway.' " Lumont explained that, in his social structure, "got at" means to "shoot at."

Consistent with our conclusion that the trial court did not abuse its discretion in excluding Kefentse's statements to Martin, we conclude that the court did not abuse its discretion in excluding Kefentse's statements to Lumont. First, Kefentse sought out Lumont at Jamila's house a few hours after DeMarcus was killed, and this shows the statements' spontaneity. Also, Kefentse inquired about Lumont's well being, which shows that Kefentse and Lumont were close acquaintances, and the State generally concedes this point. These factors weigh in favor of admission.

Second, the absence of evidence of Kefentse's presence at the scene does not corroborate Kefentse's statements to Lumont. Third, Kefentse's statement that he "got at" Alex inculpates him in DeMarcus's death. Fourth, Kefentse was incarcerated and could have been subpoenaed for cross-examination. While several of the Chambers factors

support the admission of Kefentse's statements to Lumont on the morning after DeMarcus's death, we conclude that the trial court did not abuse its discretion in excluding them.

The State argues that Lumont's testimony on this topic is untrustworthy because his desire to evade punishment provides an overwhelming motive to testify falsely about his conversation with Kefentse. Indeed, " '[g]eneral admission of such statements could seriously handicap the administration of justice in tempting everyone accused of crime to introduce perjured testimony that a third party, then deceased or beyond the jurisdiction of the court, had declared that he, and not the accused, had committed the crime.' " Tenney, 205 Ill. 2d at 433-34, quoting People v. Lettrich, 413 Ill. 172, 178 (1952). In excluding the statements, the trial court implicitly found that Lumont's motive to fabricate Kefentse's out-of-court confession outweighed the indicia of reliability. Kefentse's statements to Lumont are even more reliable than his statements to Martin, because the former occurred only one day after the shooting. Nevertheless, we agree with the State that the trial court's decision to exclude the statements to Lumont was not "fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." (Emphasis added.) See Ortega, 209 Ill. 2d at 359. Although a reasonable course would have been to admit the statements and allow the State to argue to the fact finder that Lumont's bias renders him incredible, the totality of the circumstances does not so strongly support the admission of Kefentse's statements to Lumont that no reasonable person would agree with their exclusion.

### 3. Casel Montgomery's Statements to Dennis Mackey

Finally, Dennis Mackey was 20 years old and serving a three-year sentence for an unrelated offense at the time of defendant's trial. Dennis testified that he discussed

defendant's case with Detective Randall on July 2, 2002. At that time, Dennis was not facing any criminal charges.

Dennis told Detective Randall that he had spoken with Casel Montgomery about the incident while they were incarcerated in the same cell in the Winnebago County jail. Dennis was uncertain of the date of the conversation, but he recalled that it occurred sometime between June 1 and June 26, 2002, when he received his sentence. While Dennis and Casel shared the cell, Casel frequently paced at night, unable to sleep. Dennis testified as follows:

"One night he just told me, he was like 'man, you can't tell nobody, but me and Nitty [Kefentse Taylor], we killed the little boy.'

* * *

He was like--I guess they was at--going from the club or something at Catfish City, and Alex, he supposed to have shot at 'em or something. Then he said he got the gun, Café [Casel] said he got the gun from somebody else, and then him and Kefentse, they went and shot up one of their houses, then they went to the other house. I ain't familiar with the west side streets, but he said they parked like a block over and they came through the yard and they shot through the window, and then he dropped Kefentse off on Blaisdell [Street] and he went home. The next day he found out he was--the little boy had got killed, and he called Kefentse and told him to come over there. He told Kefentse he had to get rid of the guns, but he [was] the only one that knew where they was at, so Kefentse, he took the guns and left and he told them to put them somewhere in Rock Cut in the sewer."

Dennis testified that he and Casel spoke about the incident "a couple times" because it was bothering Casel. Dennis stated that he and Casel were both members of the Black P. Stones gang and that he knew Casel before they shared the cell. Dennis further testified that Casel showed him a photograph that Casel's girlfriend had sent to the jail. The photo displayed Kefentse and someone else standing in front a red "Grand Caprice" or "Grand Am."

While Kefentse's statements to Martin and Lumont have at least some indicia of trustworthiness, Casel's statements to Dennis are much less reliable. We conclude that the trial court did not abuse its discretion in excluding Casel's alleged out-of-court confession. First, Dennis and Casel do not qualify as a close acquaintances. While they might have been members of the same gang, the only evidence of a relationship is from their cohabitation in a jail cell. Also, the statements were not made spontaneously soon after the crime, because Dennis's testimony shows that Casel first raised the topic two months after DeMarcus's death.

Second, some of the statements are inconsistent with both sides' views of the case. Dennis asserted that Casel admitted to shooting at two homes, but this runs contrary to the forensic evidence and the other testimony that showed that DeMarcus's house was the only target. Also, Dennis stated that Casel showed him a photograph of the red car that ostensibly was used to conceal the offenders' identity. However, the rental car employee testified that Casel's girlfriend returned the red car and rented a Taurus one day after the crime. Common sense suggests that, if Casel and his girlfriend were so eager to dispossess themselves of the red car, they likely did not photograph it for posterity as Dennis suggested.

Third, the statements were self-incriminating and against Casel's penal interest because they inculpated him in the crime. Fourth, Casel was incarcerated at the time of defendant's trial and therefore could have been subpoenaed for cross-examination. While the third and fourth factors support admitting Casel's statements to Dennis, we conclude that, under the totality of the circumstances, the trial court did not abuse its discretion in excluding them.

### B. Sufficiency of the Evidence

The trial court entered judgment on count III of the indictment, which alleged that, on April 14, 2002, defendant committed first-degree murder in that he, "without lawful justification, shot DeMarcus Hanson in the head with a firearm, knowing such act created a strong probability of death or great bodily harm to DeMarcus Hanson or another, thereby causing the death of DeMarcus Hanson." See 720 ILCS 5/9--1(a)(2) (West 2004). "A person who kills an individual without lawful justification commits first-degree murder if, in performing the acts which cause the death, he knows that such acts create a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9--1(a)(2) (West 2004). On appeal, identification is the only basis on which defendant challenges the guilty finding. Defendant concedes that DeMarcus was the victim of first-degree murder, but he argues that Kefentste and Casel committed the crime.

A reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. When presented with a challenge to the sufficiency of the evidence, it is not the function of a reviewing court to retry the defendant. People v. Collins, 106 Ill. 2d 237, 261 (1985). "When reviewing the sufficiency of the evidence, 'the relevant question is whether, after

viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) <u>People v. Bishop</u>, 218 Ill. 2d 232, 249 (2006), quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); <u>Collins</u>, 106 Ill. 2d at 261.

Alex and Lataurean, who were admittedly prejudiced against defendant, testified that they exchanged insults with--and Alex fired his gun at--defendant, Lumont, and Anthony. Alex testified that, after he fired the shots, he and Lataurean went to Estella's house, where Alex hid his gun under a car on the driveway. Alex walked back down the driveway as a red car pulled up. According to Alex and Lataurean, defendant, Lumont, and Anthony exited the red car and chased Alex. Alex ran up the driveway and through his mother's backyard before hiding behind the garage. Lumont and Anthony had run down the other side of the house to cut him off, and Alex heard four or five gunshots about 20 seconds later. Alex continued hiding for a few moments before walking to the front of the garage and seeing Lumont and Anthony run toward the red car. Other evidence established that the shots fired into the house killed the victim. The person who fired the four shots through the bedroom window knew or should have known that such acts created a strong probability of death or great bodily harm to DeMarcus or someone else inside.

Alex testified that Lumont and Anthony each carried a chrome handgun, but he did not accuse defendant of carrying a weapon. Nevertheless, based on the evidence, defendant could be found guilty of murder on an accountability theory. To prove an offense by accountability, the State must prove that, either before or during the commission of an offense, the defendant solicited, aided, abetted, or agreed or attempted to aid another in

the planning or commission of the offense. 720 ILCS 5/5--2(c) (West 2004). While mere presence at the scene of an offense is not culpable, proof of the defendant's presence during the commission of a crime without opposing or disapproving it, his maintenance of a close affiliation with the principal afterwards, and his failure to report the crime are all factors that may be considered in determining legal accountability. People v. Johns, 345 Ill. App. 3d 237, 241-42 (2003). The evidence at trial supports each of these factors.

The "common design rule" provides that, where two or more persons engage in a common criminal design or agreement, any further acts committed by one party are considered to be the acts of all parties to the common design, and all are equally accountable for the consequences of such further acts. A common design may be inferred from the circumstances surrounding the commission of a crime. Johns, 345 Ill. App. 3d at 242. In this case, the evidence supports the inference that defendant joined in the common design of shooting into the house in an attempt to kill Alex. Although Alex was clearly the target, defendant can be accountable for the victim's death because he assisted in chasing Alex and securing the area so shots could be fired into the house.

C. Alternative Harmless-Error Analysis

Finally, we address the issue that defendant raises in his motion to cite additional authority: whether the recent Supreme Court decision in Holmes v. South Carolina, 547 U.S. ___, 164 L. Ed. 2d 503, 126 S. Ct. 1727 (2006), compels us to grant defendant a new trial. The State argues that "even assuming arguendo that the trial court abused its discretion [in excluding the statements], such error was harmless given the strong evidence of guilt adduced by the prosecution." Defendant cites Holmes for the proposition that the harmless-error doctrine may not excuse the erroneous exclusion of third-party-guilt

evidence. We held above that the trial court did not abuse its discretion in excluding the out-of-court confessions. We further hold that, even if the trial court erred in excluding the confessions, Holmes does not abrogate the use of harmless-error analysis in reviewing the erroneous exclusion of third-party-guilt evidence.

Holmes was charged with several offenses related to the beating, rape, and robbery of an elderly woman. Holmes was initially convicted but won a new trial on postconviction review. In the second trial, he attempted to introduce proof that another person, Jimmy McCaw White, committed the charged offenses. The proof was testimony that White was in the victim's neighborhood on the morning of the assault and that White either acknowledged Holmes's innocence or admitted to committing the crimes himself. The trial court barred the evidence, and Holmes was convicted primarily on forensic evidence that he disputed. Holmes, 547 U.S. at ___, 164 L. Ed. 2d at 508, 126 S. Ct. at 1730.

On appeal, the South Carolina Supreme Court found no error in the exclusion of the third-party-guilt evidence, reaffirming its rule that " 'where there is strong evidence of an appellant's guilt, especially where there is strong forensic evidence, the proffered evidence about a third party's alleged guilt does not raise a reasonable inference as to the appellant's own innocence.' " Holmes, 547 U.S. at ___, 164 L. Ed. 2d at 508, 126 S. Ct. at 1731, quoting State v. Holmes, 361 S.C. 333, 342-43, 605 S.E.2d 19, 24 (2004). Applying this standard, the South Carolina Supreme Court held that Holmes's evidence of third-party guilt was inadmissible because he could not " 'overcome the forensic evidence against him to raise a reasonable inference of his own innocence.' " Holmes, 547 U.S. at ___, 164 L. Ed. 2d at 508, 126 S. Ct. at 1731, quoting Holmes, 361 S.C. at 343, 605 S.E.2d at 24.

The United States Supreme Court found that the South Carolina evidentiary standard violated Holmes's rights because it was based on the faulty logic that, if it is clear that only one person committed the offense and there is strong evidence that the defendant was the offender, it follows that evidence of third-party guilt must be weak. Holmes, 547 U.S. at ___, 164 L. Ed. 2d at 508, 126 S. Ct. at 1734. The Court reasoned as follows:

"Just because the prosecution's evidence, if credited, would provide strong support for a guilty verdict, it does not follow that evidence of third-party guilt has only a weak logical connection to the central issues in the case. And where the credibility of the prosecution's witnesses or the reliability of its evidence is not conceded, the strength of the prosecution's case cannot be assessed without making the sort of factual findings that have traditionally been reserved for the trier of fact and that the South Carolina courts did not purport to make in this case.

The rule applied in this case is no more logical than its converse would be, i.e., a rule barring the prosecution from introducing evidence of a defendant's guilt if the defendant is able to proffer, at a pretrial hearing, evidence that, if believed, strongly supports a verdict of not guilty. In the present case, for example, the petitioner proffered evidence that, if believed, squarely proved that White, not petitioner, was the perpetrator. It would make no sense, however, to hold that this proffer precluded the prosecution from introducing its evidence, including the forensic evidence that, if credited, provided strong proof of the petitioner's guilt.

The point is that, by evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt. Because the rule applied by the

State Supreme Court in this case did not heed this point, the rule is 'arbitrary' in the sense that it does not rationally serve the end that *** third-party guilt rules were designed to further. Nor has the State identified any other legitimate end that the rule serves. It follows that the rule applied in this case by the State Supreme Court violates a criminal defendant's right to have ' "a meaningful opportunity to present a complete defense." ' Crane, 476 U.S. at 690, 106 S. Ct. at 2142 (quoting Trombetta, 467 U.S. at 485, 104 S. Ct. at 2528)." (Emphasis in original.) Holmes, 547 U.S. at ___, 164 L. Ed. 2d at 512-13, 126 S. Ct. at 1734-35.

Defendant confuses the two-part analysis attendant to the review of evidentiary issues: (1) whether the evidence is admissible, and (2) if the trial court's ruling on admissibility was erroneous, whether the error is reversible. In Holmes, the United States Supreme Court vacated the judgment and remanded the cause for further proceedings because the South Carolina Supreme Court applied an unconstitutional test for determining the admissibility of third-party-guilt evidence. The State did not argue--and the Court did not consider--whether the error was harmless beyond a reasonable doubt. Therefore, Holmes governs only the admissibility prong of the two-part test.

Here, the trial court used the well-settled principles of admissibility set forth in Chambers. Unlike Holmes, defendant does not argue that the trial court employed an unconstitutional standard for determining admissibility. Nothing in Holmes suggests that an evidentiary decision, though erroneous under Chambers, requires a new trial even if it is harmless. We hold that the trial court did not abuse its discretion in excluding the out-of-court confessions. We further hold that, even if the court had erred, the admission might have been excused as harmless error, but we need not decide that issue here.

CONCLUSION

For the preceding reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

GROMETER, P.J., concurs.

JUSTICE O'MALLEY, specially concurring:

I write separately to stress that it is not, as the majority claims, a "close issue" whether the trial court's decision to exclude Kefentse's statements was arbitrary. Slip op. at 17. The substantive law and the standard of review combine in this case to make affirmance compelled.

Generally, the substantive law is disposed against the admission of third-party confessions to a crime. In Chambers, the United States Supreme Court said that such confessions "are often motivated by extraneous considerations and *** are not as inherently reliable as statements against pecuniary or proprietary interest." Chambers, 410 U.S. at 300, 35 L. Ed. 2d at 311, 93 S. Ct. at 1048. Such confessions are admissible, held the Court, if made under circumstances that provide " 'considerable assurance of reliability.' " Lilly v. Virginia, 527 U.S. 116, 130, 144 L. Ed. 2d 117, 130, 119 S. Ct. 1887, 1897, quoting Chambers, 410 U.S. at 299, 35 L. Ed. 2d at 311, 93 S. Ct. at 1047. Our supreme court has held that such confessions are "generally inadmissible" (Tenny, 205 Ill. 2d at 433). While Kefentse's statements each met at least two of the Chambers factors, "the existence of one or more of the [Chambers] factors does not make a statement necessarily trustworthy." Gallano, 354 Ill. App. 3d at 957. Rather, "it is for the trial court to determine by the totality of the circumstances whether it considers the hearsay statement to be trustworthy." Gallano, 354 Ill. App. 3d at 957.

The substantive law, then, tends toward the exclusion of third-party confessions, and by virtue of that law alone Kefentse's statements were presumptively suspect. There is another presumption at work here, too, and it favors our affirming the trial court's decision excluding those statements. Our review here is nearly "no review at all" (D.T., 212 Ill. 2d at 356), for we are to sustain the trial court's decision unless it is "fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it" (Ortega, 209 Ill. 2d at 359). As the majority explains, Kefentse's statements lacked any real corroboration. Kefentse supposedly told Martin and Lumont that he (Kefentse) killed the victim, but he provided absolutely no details about the shooting and made no suggestion as to what could have been his motive. In fact, neither the statements nor their context tells us who Kefentse is other than that he knew Martin and Lumont and that he was with Lumont sometime on the night of the shooting. I suggest that the Tenney presumption was designed precisely to guard against a confession like Kefentse's: a bare, unsubstantiated "I did it!" from a person who emerges from the woodwork. By calling this a "close issue" the majority implies it is close to believing that the trial court came to a decision with which no reasonable person could agree. I do not share this view. Quite to the contrary, I believe the trial court's decision clearly comports with the applicable case law.

I should also point to some remarks that preface the majority's analysis of Kefentse's statements. The majority claims that it "most likely" would have admitted Kefentse's statements had it been in the trial court's position. Slip op. at 13. I cannot dispute the truth of this remark, nor do I question its appropriateness, for the majority does well to contrast the role of a trial court with that of an appellate court. However, I do wonder what point is served with the majority's further remark that "[m]any other [trial] judges likely would have also [admitted Kefentse's statements]." Slip op. at 13. I do not know if "many" judges would have admitted the statements, but I do know of two

judges who did not admit them, namely, Judge McGraw in this case and Judge Grubb in the companion case, <u>People v. Ross</u>, No. 2--04--0391 (2006) (unpublished order under Supreme Court Rule 23), where Kefentse's statements were also proffered.