# Illinois Official Reports

## Appellate Court

*People v. Parker*, 2019 IL App (3d) 160455

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEANTHONY TERRANCE PARKER, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-16-0455 |
| Rule 23 order filed<br>Motion to<br>publish allowed<br>Opinion filed | June 4, 2019<br><br>June 14, 2019<br>June 14, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Rock Island County, No. 14-CF-827; the Hon. Walter D. Braud, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Jonathan Pilsner, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>John L. McGehee, State's Attorney, of Rock Island (Patrick Delfino, Thomas D. Arado, and Mark A. Austill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

Panel                    JUSTICE CARTER delivered the judgment of the court, with opinion
                         Presiding Justice Schmidt and Justice O'Brien concurred in the
                         judgment and opinion.


## OPINION

¶ 1    Defendant, Deanthony Terrance Parker, appeals following his conviction for robbery. He raises numerous contentions of error relating to his trial and sentencing. We affirm.

¶ 2                              I. BACKGROUND

¶ 3    The State charged defendant with one count of armed robbery (720 ILCS 5/18-2(a)(1) (West 2014)). The charging instrument alleged that defendant, while armed with a knife and threatening the imminent use of force, took jewelry and $1400 from Corrina Shaffer.

¶ 4    Defendant filed a motion *in limine* requesting that the court bar the State from introducing evidence relating to, *inter alia*, defendant's prior criminal record. In the same motion, defendant also sought to bar the introduction of "[a]ny fingerprint evidence[,] as the testimony by the State's witness[es] regarding this evidence will lead to comments, discussions or inferences of Defendant's prior criminal history or arrest record."

¶ 5    The court considered defendant's motion prior to trial. First, the parties agreed that the State would introduce evidence of three prior convictions for impeachment purposes only if defendant elected to testify at trial. On the topic of the fingerprint evidence, defense counsel relayed to the court an agreement between he and the State:

> "I talked with [the prosecutor] a little bit about this yesterday. I think he's in agreement, if Your Honor allows all the fingerprint evidence in, that we have to tip-toe kind of carefully around some of the issues. My understanding is that Rock Island police officer Mr. Alderson that got the fingerprints analysis, first runs it through the AFIS, or their local computer system has a hit. I don't want that mentioned, because that indicates that his fingerprints are in the system already, thus being arrested or charged with—"

The court interjected, stating: "All right. The fingerprints will be admitted. State will be careful." The State explained that its witness would not discuss the computer match or mention the date on which the known prints had been collected. The court concluded: "[The fingerprints] will be admitted, but the jury will not be advised that they—that the source of the fingerprints was from the police database."

¶ 6    At trial, Shaffer testified that she and her friend, Shanice, went to a number of bars or clubs on the evening of September 26, 2014. At one point, Shaffer and Shanice met Shanice's friend, Zach, and defendant. Shaffer identified defendant in court. The four remained at a club until 3 a.m., at which time they decided to go to Zach's house to smoke marijuana. Defendant rode in Shaffer's car while Shanice drove with Zach. The plan had been for Shaffer to follow Zach to his house. However, Zach and Shanice were pulled over by the police almost immediately. After briefly waiting at a gas station, Shaffer decided to return to her house with defendant.

¶ 7    After arriving at Shaffer's house, Shaffer and defendant sat in her living room and talked. Shaffer testified that they also drank wine and smoked marijuana. During that time, Shaffer

also made a number of phone calls in an effort to find Shanice to determine how she could help her. Shaffer eventually learned that Shanice's bond would be $200. Shaffer went upstairs to retrieve the money while defendant spoke to Zach on the phone. When Shaffer returned to the living room, she and defendant decided they would go to the police station together.

¶ 8        Shaffer described what happened next: "I stood up, and that is when [defendant] blind-sided me and punched me in the face." Defendant then demanded that she show him where her safe was, as well as "all the pounds of weed." Shaffer testified that she did not have a safe nor did she have pounds of marijuana. Defendant produced a box cutter and threatened to cut or rape Shaffer.

¶ 9        Defendant and Shaffer went upstairs, where he instructed her to pack her shoes and purses into bags. Defendant also put jewelry from Shaffer's jewelry box into his pockets. Shaffer recounted the jewelry that was taken: "a diamond Rolex, a Movado watch, a Michael Kors watch, a custom-made Johnny Dang diamond watch, a diamond pendant." Defendant also took Shaffer's cell phone and the keys to her car. Defendant forced Shaffer to take the bags of stolen items to the car. Shaffer put the bags in the trunk. As defendant turned to reenter the house, Shaffer ran away. When she arrived at a gas station half a block away, the cashier called 911. Police officers arrived in 5 to 10 minutes.

¶ 10        Shaffer testified that the only stolen item recovered by police was the Johnny Dang watch. She identified People's exhibit No. 4 as that watch. She identified People's exhibit No. 8 as the box that held that watch. Shaffer also identified People's exhibit No. 17 as a photograph of her living room after her encounter with defendant. She identified a wine glass sitting on an ottoman in the photograph as the one used by defendant. Shaffer testified that she had recently washed the wine glass before giving it to defendant. Shaffer also testified that her cell phone had service through T-Mobile and that the phone was registered to her grandmother, Marilyn Hoffman.

¶ 11        Rock Island police officer Luke Serra was dispatched to Shaffer's residence at approximately 5 a.m. Shaffer had been transported by another officer back to her home. Serra observed bruising and swelling around Shaffer's left eye, in addition to some dried blood. Serra asked if the person who had robbed her had touched anything in the house. Shaffer pointed out the wine glass on the ottoman. Serra took a series of latent prints from the wine glass, preserving them on a fingerprint evidence card.

¶ 12        Shannon Kizer of the Rock Island Police Department testified that he was responsible for obtaining fingerprints. Kizer was shown People's exhibit No. 1, a card showing 10 fingerprints, labeled with defendant's name. The following colloquy ensued:

"[PROSECUTOR]: *** what is People's Exhibit No. 1?

[KIZER]: Fingerprints, Deanthony Parker.

Q. And did you obtain those fingerprints?

A. I don't know.

Q. Are they associated with [defendant]?

A. Yes.

Q. Are they [defendant's] fingerprints?

A. Yes."

Defense counsel objected to the admission of exhibit No. 1 into evidence, arguing that Kizer could not say if he personally gathered the fingerprints and that Kizer likely only testified that

the fingerprints were defendant's because the exhibit itself stated as much. The court did not rule on the objection, instead suggesting that defense counsel could cross-examine Kizer at the conclusion of the State's questioning.

¶ 13    The State next asked Kizer to view People's exhibit No. 1a. That exhibit was a Rock Island County booking report dated August 3, 2014. The booking report, which lists 12 "prior bookings," shows Kizer as the "Fingerprint Officer." It also has a photograph of an African-American male. The State asked Kizer only if the information on exhibit No. 1a was "associated with the fingerprint card, People's 1." Kizer agreed. The State then asked if the exhibit contained a photograph and if that photograph was of defendant. Kizer responded affirmatively.

¶ 14    On cross-examination, defense counsel asked Kizer a number of questions relating to the procedures he employed in obtaining fingerprints as part of the booking process. Counsel asked Kizer if defendant's fingerprints had been scanned by a computer, and Kizer responded that they had.

¶ 15    Eugenio Barrera of the Rock Island Police Department testified that he went to Tony's Pawn Shop in the course of his investigation. The owner of the pawn shop showed Barrera a photograph of a watch that someone had attempted to pawn. The owner provided Barrera with a description of the individual's car, the license plate number, and surveillance footage. Barrera testified that the individual who had attempted to pawn the watch was Joswa Lewis.

¶ 16    On October 6, 2014, Barrera confronted Lewis, telling him that the watch was stolen property. Lewis denied taking any part in a robbery. He told Barrera that he had purchased the watch from a man at a car wash. Lewis went into the residence at 1120 19½th Avenue, retrieved the watch, and gave it to Barrera. Barrera testified that the residence belonged to Pearline Morrow, Lewis's grandmother-in-law. Barrera identified exhibit No. 4 as the watch that Lewis gave to him.

¶ 17    Following Barrera's testimony, the State moved to admit exhibit Nos. 1 and 1a. Defense counsel objected, again arguing that Kizer had no personal recollection of taking the fingerprints. The court admitted the exhibits but noted that they would not go to the jury.

¶ 18    Garrett Alderson testified that he was a criminalist with the Rock Island Police Department, responsible for, *inter alia*, comparative fingerprint analysis. After a series of preliminary questions about his qualifications and training, the State submitted Alderson as an expert. Over the defense's objection, the court found Alderson qualified as an expert in the field of fingerprints.

¶ 19    Alderson testified that he compared the known prints found on exhibit No. 1 to the latent prints recovered by Serra at Shaffer's home. He concluded that the latent fingerprints were left by the same person who provided the fingerprints in exhibit No. 1. Alderson testified that the fingerprints matched on approximately 20 points, which he considered a high quality match for a latent print. He estimated that most of the latent prints he examined have between 6 and 10 usable points.

¶ 20    Timothy Doty testified that he was an evidence technician with the Bettendorf Police Department. Doty explained his duties as an evidence technician, the following exchange occurred:

"[THE STATE]: Do you have any training in fingerprint identification?
[DOTY]: Yes, I do.

- 4 -

[THE STATE]: And what was that training?

THE COURT: Is there a question about the qualification of this witness?

[DEFENSE COUNSEL]: I'd object. I'm not sure he's gone through the proper foundation yet, Your Honor.

THE COURT: Well he's a listed witness, and that has to be taken care of before we get here. Is there a question about his qualifications?

[DEFENSE COUNSEL]: I've just—I haven't been provided any of his qualifications, Your Honor. I would assume [the State] is going to go through the usual battery of questions here to—

THE COURT: Well, a pretrial order is to prevent us from spending time going through things where we already know what the result is going to be, and this is one of those situations. You're going to offer this witness as an expert?

[THE STATE]: One question.

*** Have you been qualified as an expert before in the area of fingerprint identification?

[DOTY]: Yes, I have.

[DEFENSE COUNSEL]: I'll object for the record, Your Honor.

THE COURT: Very good."

Doty then testified that he also compared the latent prints collected by Serra with those found in exhibit No. 1. Like Alderson, Doty concluded that those fingerprints matched.

¶ 21　　On cross-examination, Doty testified that he has worked with Alderson for 2½ years. In that time, he had conducted approximately 100 fingerprint comparisons brought to him by Alderson. Doty's job was to determine whether Alderson's conclusions were correct. Doty also testified that he had completed 240 hours of classroom work in fingerprint analysis, as well as 16 hours of training through the Federal Bureau of Investigations (FBI). He had 14 years of experience in gathering latent fingerprints.

¶ 22　　Brett Buchen of the Rock Island Police Department testified that he spoke to Shaffer on September 29, 2014, two days after the incident. Buchen recounted that Shaffer had previously described her assailant as a black male wearing a black shirt with an Adidas logo on it. Buchen showed Shaffer an array of six photographs. When she was shown the photograph of defendant, fourth in the array, Shaffer told Buchen, " 'I'm almost certain that's him.' " Buchen clarified on cross-examination that he included defendant's photograph in the array because defendant was, at that point, as suspect in the investigation. He also testified that Pearline Morrow was defendant's aunt.

¶ 23　　Buchen testified that, at a later date, he obtained an arrest warrant for defendant and a search warrant for the residence at 1120 19½th Avenue, the same residence from which Lewis had retrieved the Johnny Dang watch for Barrera. The warrants were executed on October 9, 2014. Defendant was found in the basement of that residence and arrested. Two or three people were in the basement with defendant; Lewis was not among them. Buchen testified that in the basement officers found a Johnny Dang jewelry box, a black T-shirt with an Adidas logo, and a broken SIM card. The jewelry box was labeled at trial as exhibit No. 8.

¶ 24    Ronald Witt, a trial specialist with T-Mobile, testified that he examined the broken SIM card found at 1120 19½th Avenue. He explained that a SIM card is a chip inside a cell phone that stores all the data. Witt testified that the SIM card was registered to Marilyn Hoffman.

¶ 25    In closing argument, the prosecutor, after summarizing the evidence, broached the subject of the fingerprints. He referred to a high-profile European case that involved an incorrect fingerprint identification. Defense counsel had referenced that same case in his cross-examinations of Alderson and Doty. The prosecutor pointed out that the false identification in that case had been discovered when a second fingerprint expert came forward and pointed it out. He continued:

> "If you want to prove that something's wrong—And the defendant doesn't have to prove anything. I mean, don't get me wrong here. I'm not saying that they've got to prove something, but if they want to get up—they want to say he's wrong, provide some evidence. You don't just get up and say: [']Well, somebody at one time in the history of the world that does this made a mistake, so, therefore, it's gone. Can't trust it at all.['] Or, as in the Madrid bombing, you could find an expert that says: [']You know what? Alderson and Doty are wrong. They don't know what they're talking about.['] He isn't here. Like I said, don't think they have to prove that—prove that, but if you want to get up here and say it, you should be able to prove it."

¶ 26    Defense counsel, in his argument, noted that police had declined to test for further forensic evidence, such as DNA or fingerprints from other surfaces. In reference to "the State's two expert witnesses," counsel also argued that fingerprint analyses can be incorrect, as was the case in the Madrid bombing.

¶ 27    In rebuttal, the prosecutor took exception to the suggestion that police should have tested more forensic evidence. He began his comments: "36 years of this. Blame the victim. Try the cops. Blame the victim. Try the cops. *** About two-thirds of what [defense counsel] talked about, if he really wanted it done, he could have done it." The prosecutor continued on that subject for much of the rebuttal, pointing out the impracticality of conducting testing on the scale suggested by defense counsel and repeatedly offering that defendant was free to test any evidence himself. He also pointed out the inconsistency in defense counsel arguing that fingerprints were unreliable evidence while also arguing that the police should have searched for more fingerprints.

¶ 28    During deliberation, the jury sent a written question to the court. It read: "When was the known print obtained? Is it before or after she identified him in the lineup?" Defense counsel pointed out that the State had been intentionally vague about the acquisition of the known print because it was taken from one of defendant's prior arrests. He also suggested that the jury may have actually been referring to the latent print taken from the wine glass. The court brought the jury in to discuss the question. The foreperson clarified that there was no confusion regarding the difference between known and latent prints. The jury was then sent out once again.

¶ 29    The State informed the court that the fingerprint had originally been taken from defendant on August 3, 2014. Alderson had obtained that known fingerprint for comparison purposes on September 29, 2014. The State noted that to tell the jury that the Rock Island Police Department had obtained the fingerprint in early August would imply that defendant had been previously arrested. Defense counsel suggested that "the delicate way to do it" would be for the court to

tell the jury that "Garrett Alderson *** obtained the known print on September 29." The court opined that such an answer would only further confuse the jury.

¶ 30 The court pointed out that the fingerprints were "clearly there before the photo array." Defense counsel agreed, adding: "And I—I just want to stay clear of when the known was rolled, that was before any of this happened. That's the danger zone." The State then suggested the following answer: "When Detective Buchen placed the defendant's photograph in the photo array, he had been told there was a fingerprint match." The court and the State refined that answer over the course of two pages of record, uninterrupted by defense counsel. Later, defense counsel interjected: "Your Honor, I guess, in reflecting on this, I'm concerned about the word 'matched them' ***. So, maybe if we just say that he had in his possession the known prints and latent prints before Detective Buchen presented it." The State agreed.

¶ 31 The court then suggested the following answer: "The known prints of the defendant were obtained and in possession of the Rock Island Police Department before the victim identified the defendant in the lineup. Now, that's a simple way of saying it." Defense counsel replied: "Yes, let's—If that's the way you're going to say it, Your Honor, that's—that's." The court cut off defense counsel to bring the jury in and read that answer.

¶ 32 The jury found defendant guilty of the lesser included offense of simple robbery. Defendant subsequently filed a motion for a new trial in which he argued, *inter alia*, that the court had erred in answering the jury's question, the State had failed to lay a foundation for Doty's testimony, and the State had shifted the burden of proof in closing arguments by suggesting defendant could have tested various pieces of evidence for DNA or fingerprints.

¶ 33 The court heard defendant's motion just prior to his sentencing hearing. In arguing his motion, defense counsel contended that the court should have answered the jury's question only by stating that the jury was asking for a fact not in evidence. The court asked defense counsel if everyone had agreed on the answer to the question. Defense counsel replied: "Your Honor, we did. I agreed ultimately." The court denied the motion in full.

¶ 34 Defendant's sentencing hearing concerned his robbery conviction, as well as a separate conviction for unlawful possession of weapon by a felon (UPWF), not at issue in this appeal. A presentence investigation report (PSI) was prepared for the sentencing hearing. The PSI showed that defendant had 14 prior criminal convictions, including felony convictions for mob action, reckless discharge of a firearm, attempted home invasion, and aggravated battery with great bodily harm. His misdemeanor convictions included multiple domestic violence incidents and multiple occasions of resisting or fleeing from a peace officer.

¶ 35 The court observed that defendant had "a terrible record, *** filled with violence from time to time," and that the violence had been consistent throughout his life. The court found that defendant was "very likely to offend" again in the future. The court continued: "You have a bad past history, criminal. These circumstances will almost guarantee to be occurring again, at least in my opinion. You would not be able to make it on a period of probation. I have an obligation to protect the public and deter others." The court sentenced defendant to a term of 12 years' imprisonment on the UPWF charge, commenting: "I just can't find room to get you under twelve years because you are such a high risk offender. *** [T]he sooner I put you out on the street, the sooner I'm going to put the people on the street at risk."

¶ 36 Turning to the robbery conviction, the court stated immediately, "It will be consecutive to the twelve years." The court observed that defendant would be "a much older person" by the time his sentences expired and sentenced him to a term of six years' imprisonment for the

robbery.

¶ 37                                    II. ANALYSIS

¶ 38     On appeal, defendant argues that the circuit court abused its discretion by allowing the jury to consider the fingerprint evidence. He also argues that the court erred by answering the jury's question "with evidence which was never testified to." Next, defendant argues that the State improperly shifted the burden of proof in closing arguments. Finally, he argues that the court erred in imposing consecutive sentences. We address each argument in turn.

¶ 39                                A. Fingerprint Evidence

¶ 40     Defendant raises two contentions of error with respect to the admission of fingerprint evidence at trial. First, he argues that the State failed to lay a proper foundation establishing that the fingerprints located on exhibit No. 1 were, in fact, those of defendant. Second, he argues that the court erred in allowing Doty to offer expert conclusions where the State failed to establish his qualifications and training.

¶ 41                              1. People's Exhibit No. 1

¶ 42     At trial, Alderson testified that the known fingerprints on exhibit No. 1 matched those extracted by Serra from the wine glass in Shaffer's home. It was Kizer who testified that the fingerprints on exhibit No. 1 belonged to defendant. Defendant challenges this testimony, arguing that no foundation for Kizer's knowledge of that fact was ever presented to the jury.

¶ 43     Initially, we note that defendant failed to properly preserve this issue by raising it in his posttrial motion. He also does not argue on appeal that we should conduct plain error review. The State, however, does not assert that defendant has forfeited the issue. Because forfeiture is akin to an affirmative defense that must be raised by the appellee, the forfeiture argument itself is forfeited. *People v. Blair*, 215 Ill. 2d 427, 442 (2005). We will address the issue on its merits. *Id.*; *People v. Beachem*, 229 Ill. 2d 237, 241 n.2 (2008).

¶ 44     Illinois Rule of Evidence 103(d) (eff. Oct. 15, 2015) states: "In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means ***." Similarly, Rule 104(c) dictates: "Hearings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury. Hearings on other preliminary matters shall be so conducted when the interests of justice require, or when an accused is a witness and so requests." Ill. R. Evid. 104(c) (eff. Jan. 1, 2011). Finally, and most broadly, Rule 104(a) dictates "[p]reliminary questions concerning *** the admissibility of evidence shall be determined by the court." Ill. R. Evid. 104(a) (eff. Jan. 1, 2011).

¶ 45     At trial, Kizer testified that the known fingerprints in exhibit No. 1 belonged to defendant. When he was asked if he obtained those fingerprints from defendant, Kizer stated that he did not know. This was insufficient to show that Kizer knew the fingerprints on exhibit No. 1 belonged to defendant. Defendant's argument, however, presupposes that the State was obligated to provide such a foundation *at trial*. The rules of evidence clearly show that this is not the case.

¶ 46     Foundation "is 'evidence or testimony that establishes the admissibility of other evidence.' " *People v. Bush*, 214 Ill. 2d 318, 333 (2005) (quoting Black's Law Dictionary 682

(8th ed. 2004)). As a condition for admissibility, the question of proper foundation is one to be determined by the court, rather than the jury. See Ill. R. Evid. 104(a) (eff. Jan. 1, 2011). Rules 103(d) and 104(c) make clear that the court is free to make this determination outside of the hearing of the jury. See also Michael H. Graham, Handbook of Illinois Evidence § 104.1 (2018 ed.) ("[P]reliminary questions of fact as conditions precedent to admissibility or competency are generally decided by the court.").

¶ 47    Indeed, the present case illustrates the benefit of making such determinations prior to trial. The State had identified the fingerprints found in Shaffer's home as those of defendant. This identification was made by comparing, and matching, those latent fingerprints with the known fingerprints of defendant. Conveying this information to the jury necessarily required the introduction of the known fingerprints into evidence. The foundation for those fingerprints presented a challenge; testimony that the Rock Island Police Department had collected those fingerprints on the occasion of a prior, unrelated arrest of defendant would be prejudicial. Conducting an admissibility hearing prior to trial avoided that problem.

¶ 48    At the pretrial discussion of the fingerprint evidence, defense counsel explained to the court an agreement between himself and the State that if the fingerprints were admitted to the evidence, the State would "tip-toe" around the question of where the known fingerprints came from. Counsel explained that the known fingerprints were retrieved when the latent prints were run through the Rock Island Police Department computer system, and a "hit" had come up. The State had evidence, exhibit No. 1a, showing that the fingerprints were, in fact, taken by the Rock Island Police Department. The court concurred in the agreement between the parties and ruled that the fingerprints would be admitted into evidence, with the caveat that the State should not discuss their source.[1] We cannot say that this judgment constituted an abuse of discretion. See *People v. Becker*, 239 Ill. 2d 215, 234 (2010).

¶ 49    Defendant argues that "it was not impossible" for the State to introduce the fingerprint card into evidence by laying a proper foundation at trial. In support of this contention, he cites to *People v. Rhodes*, 81 Ill. App. 3d 339 (1980), as an example of the technique the State could have employed. In that case, a technician with the East St. Louis Police Department testified that she had personally fingerprinted the defendant and created the fingerprint card in question. *Id.* at 343. On redirect, the technician testified that she specifically remembered the defendant because "she had seen him under arrest four or five times." *Id.*

¶ 50    First, it is difficult to discern how this procedure would have been acceptable to defendant in this case. Defense counsel made clear that no reference to defendant's prior record should be made. The testimony of a technician or booking officer of a police department that they personally took defendant's fingerprints would surely have been objectionable to defendant. More importantly, the admission of evidence is a matter within the sound discretion of the circuit court. *Becker*, 239 Ill. 2d at 234. That similar evidence has been admitted through different procedures in other cases is not demonstrative of any error in the instant case. As we have pointed out, the method employed by the court in this case better protected defendant from a prejudicial in-court reference to his prior record than did the method in *Rhodes*. Indeed,

---

[1]Notably, counsel never asserted that the State did not have a proper foundation for the admission of the known fingerprints, only that the State needed to avoid mentioning that foundation. No objection relating to foundation was raised until trial, after the court had already ruled that the fingerprints would be admitted.

it would have been well within the court's discretion to determine that an oblique reference to the Rock Island Police Department's prior possession of defendant's fingerprints was not more prejudicial than probative. See, *e.g.*, *People v. Maldonado*, 402 Ill. App. 3d 411, 425 (2010) (finding no abuse of discretion where forensic examiner testified that she requested the defendant's fingerprint card from the "Bureau of Identification").

¶ 51                                    2. Expert Testimony

¶ 52        The State called Doty as a second fingerprint analysis expert, in order to corroborate Alderson's testimony regarding the fingerprint match. As the State began to lay the foundation for Doty's qualification as an expert, the court cut off questioning. The court asked if there was any question as to Doty's qualifications, then stated that such questioning should have been completed prior to trial. Over defense counsel's objection, the court found Doty qualified as an expert.

¶ 53        Evidence relating to fingerprint analysis must be presented through the testimony of an expert. *People v. Negron*, 2012 IL App (1st) 101194, ¶ 34. Where such testimony is to be presented, the witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Ill. R. Evid. 702 (eff. Jan. 1, 2011). The decision as to whether a purported expert is indeed qualified to testify on a certain subject is a matter within the circuit court's sound discretion. *People v. Einstein*, 106 Ill. App. 3d 526, 534 (1982).

¶ 54        The State on appeal does not dispute that the court abused its discretion when it prevented the State from establishing Doty's qualifications as an expert. There is no rule or statute mandating that such a foundation be established prior to trial, or that a witness be ruled qualified in a pretrial order. The court's interjection is even more puzzling considering that it had allowed the State to lay a proper foundation for Alderson to qualify as an expert in the same field. The only information elicited by the State prior to the court's declaration that Doty was qualified was that Doty had previously been qualified as an expert in fingerprint identification. The court's actions here were arbitrary, fanciful, and unreasonable. See, *e.g.*, *People v. Anderson*, 367 Ill. App. 3d 653, 664 (2006) (defining abuse of discretion).

¶ 55        Nevertheless, we find that the court's error in admitting unqualified expert testimony was immediately cured when defense counsel elicited Doty's qualifications on cross-examination. Doty testified that he had conducted approximately 100 fingerprint comparisons with Alderson alone, over the course of the prior 2½ years. He testified that he had completed 240 hours of classroom work in fingerprint analysis and 16 hours of training through the FBI. Doty's qualifications as an expert were thus adduced at trial[2]—if not at the correct moment—and defendant could not have suffered any prejudice as a result of the court's premature ruling.

¶ 56        In reaching this conclusion, we reject defendant's pragmatic argument. Defendant contends that once the court found Doty qualified as an expert, defense counsel "was left with no choice but to pick up the pieces and keep challenging the State's case. That included challenging Doty's credentials and expertise." He continues: "[C]ounsel could either try and challenge that expertise on cross-examination as he was required to do as [defendant's] advocate, or keep sheathed a key sword by which to attack the State's case."

_____

[2]Defendant, who makes no reference in his initial brief to Doty's cross-examination testimony, does not raise an argument that Doty was in fact unqualified.

- 10 -

¶ 57　　This argument is unavailing. Defense counsel remained free to choose his own trial strategy. Despite defendant's protestations on appeal, defense counsel never did actually challenge Doty's expertise. He merely elicited Doty's qualifications from him. Defense counsel's closing argument contained no reference to Doty's qualifications or a purported lack thereof. In fact, defense counsel referred to Doty as an expert. Defense counsel could just as easily have refrained from asking Doty about his qualifications, then argued to the jury that they had not heard any evidence that Doty was qualified to analyze fingerprints. Defense counsel instead made the strategic choice to question Doty regarding his qualifications and, in the process, cured the court's earlier error.

¶ 58　　　　　　　　　　　　　　　　B. Jury Question

¶ 59　　Defendant next argues that "the court erred when it answered a jury question with a fact that had not been testified to at trial." The State contends that defense counsel did not object to the court's answer and, in fact, acquiesced in that answer. Defendant, in his reply, insists that defense counsel "push[ed] back on the State's insistence" that the court answer the question. He maintains that defense counsel "made his objections known throughout the record" and "protested valiantly."

¶ 60　　Defendant's characterization of defense counsel's actions is unsupported by the record. At no point during the lengthy discussion regarding the jury's question did defense counsel raise an explicit objection. Defense counsel participated significantly in the formulation of the court's answer, indicating at times that he did not want the court to convey the actual date on which the known fingerprints were taken and did not want the court to refer to any "match" of fingerprints. But at no point did defense counsel ever suggest that the court should simply not answer the question. In fact, defense counsel offered his own answer to the question, proposing that the court tell the jury the known prints were in the possession of the police prior to the photographic array. See *supra* ¶ 31. The court's eventual answer paid heed to defense counsel's concerns, as it made no reference to the date of fingerprinting and did not use the word "match." When the court suggested that answer, defense counsel seemed to acquiesce.[3]

¶ 61　　In order to preserve an issue for appellate review, a defendant must make a contemporaneous objection at trial and raise that issue in a posttrial motion. *People v. Denson*, 2014 IL 116231, ¶ 18. The failure to preserve an issue for review results in forfeiture of that issue on appeal. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). In this case, nothing in defense counsel's comments can be interpreted as an objection to the court's answer to the jury's question. We thus find that the issue is forfeited. Furthermore, because defendant does not argue that the court committed plain error, we need not address the merits of this issue. See *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010) ("[W]hen a defendant fails to present an argument on how either of the two prongs of the plain-error doctrine is satisfied, he forfeits plain-error review.").

---

　　　　[3]Defense counsel's full response was: "Yes, let's—If that's the way you're going to say it, Your Honor, that's—that's." Though the court cut defense counsel off midsentence, his initial affirmative response indicates, at the very least, that an objection was not forthcoming.

¶ 62                                    C. Closing Arguments

¶ 63       Defendant next argues that the State, in both its closing and rebuttal arguments, shifted the burden of proof to defendant.

¶ 64       In the State's rebuttal argument, the prosecutor repeatedly stressed that defendant could have conducted his own forensic testing. This harangue was a direct response to defense counsel's argument that the State had failed to conduct forensic testing on multiple potential pieces of evidence. Defendant implicitly concedes that if defense counsel's closing and the State's rebuttal are viewed in isolation, the State's rebuttal commentary would not be considered burden-shifting under the invited response doctrine. See *United States v. Young*, 470 U.S. 1, 12-13 (1985) ("[I]f the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction."). However, defendant asserts that the invited response doctrine is inapplicable where it was the State that made the initial improper argument. See 88 C.J.S. Trial § 295 (2019) ("[W]here the improper argument is not, in fact, a retaliatory argument but instead is the first improper argument made, reversal is warranted.").

¶ 65       To that point, defendant argues that the State first shifted the burden of proof in its *initial* closing argument, when it argued that defendant should "provide some evidence" that the fingerprint evidence in the case was unreliable. Thus, he argues: "The burden shift had already been implanted in the jurors' ears by the State" before defense counsel's argument and the State's rebuttal.

¶ 66       Defendant acknowledges that he objected at trial only to the State's rebuttal argument. His present contention that the State's initial closing argument shifted the burden of proof, then, has been forfeited. However, defendant does request that we review this issue for plain error.

¶ 67       The first step in any plain error analysis is to determine whether a clear or obvious error was committed. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The State has the burden of proving every element of a criminal offense beyond a reasonable doubt and may not attempt to shift that burden to a defendant in closing argument. *People v. Phillips*, 127 Ill. 2d 499, 527 (1989). Our supreme court

           "has never said or implied, however, that once a defendant does present certain evidence it is beyond the reach of appropriate comment by the prosecution. There is a great deal of difference between an allegation by the prosecution that defendant did not prove himself innocent and statements questioning the relevance or credibility of a defendant's case." *Id.*

¶ 68       In the present case, the State neither suggested nor implied that defendant was obligated to prove his own innocence. Through cross-examination, the defense attacked the reliability of Alderson and Doty's fingerprint comparisons, in part by referencing a high-profile European case involving an incorrect fingerprint identification. The State observed that, in that case, the misidentification was brought to light by other experts conducting fingerprint analyses. In contrast, there was no witness in this case that contradicted Alderson and Doty's findings. Absent such evidence, the State argued, the mere fact that a mistake was once made in fingerprint identification was not a particularly compelling reason to reject the State's evidence in this case.

¶ 69       We find that the State's commentary was a fair criticism of defendant's position and did not serve to shift the burden of proof. To be sure, the State did suggest that defendant's

argument would be more availing if he "provide[d] some evidence" in support. It is improper, however, to take those three words out of context to propose that the State implied defendant must submit evidence to prove his own innocence. See *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007) ("[C]losing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context."). While the *Phillips* court opined that the State must be free to question a defendant's evidence, it follows, *a fortiori*, that the State must also be allowed to cast doubt on a defendant's theory of the case. See *Phillips*, 127 Ill. 2d at 527. That is precisely what the State did here.

¶ 70     Further, we note that even if we were to conclude that the State shifted the burden of proof, we would find that it did not amount to plain error because the evidence in this case was not closely balanced.[4] The victim in this case, Shaffer, positively identified defendant as her assailant, both at trial and shortly after the incident. Latent fingerprints were lifted from a wine glass in Shaffer's home, which Shaffer testified her assailant had handled. Two expert witnesses testified that those latent fingerprints matched the fingerprints of defendant. Moreover, a watch and a jewelry box that had been taken in the robbery were later found at the home of defendant's aunt, where defendant himself was also found. The SIM card from Shaffer's cell phone, also stolen in the robbery, was found at the same address. The evidence against defendant was overwhelming.

¶ 71                                   D. Consecutive Sentencing

¶ 72     Finally, defendant argues that the court abused its discretion in ordering his sentence for robbery to run consecutively to his sentence for UPWF "without considering the statutory factors necessary for a permissive consecutive sentence."

¶ 73     Section 5-8-4(c)(1) of the Unified Code of Corrections (Code) permits the court to impose consecutive sentences where

> "having regard to the nature and circumstances of the offense and the history and character of the defendant, it is the opinion of the court that consecutive sentences are required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." 730 ILCS 5/5-8-4(c)(1) (West 2014).

"Although the court is not required to recite the specific language of section 5-8-4[(c)(1)] when imposing consecutive sentences, the record must show that consecutive sentences were motivated by the court's belief that the public's protection required them." *People v. Span*, 337 Ill. App. 3d 239, 241 (2003).

¶ 74     Here, the court emphasized defendant's "terrible" criminal record. It found that defendant was very likely to reoffend in the future. The court noted explicitly that it had "an obligation to protect the public." Finally, the court opined: "[T]he sooner I put you out on the street, the sooner I'm going to put the people on the street at risk." Moments later, the court announced that the two sentences in question would run consecutively. The court's comments unequivocally demonstrate its belief—and the basis for that belief—that consecutive sentences were necessary to protect the public.

¶ 75     Defendant insists that the above statements by the court were made while the court was discussing the UPWF sentence and therefore were inapplicable to the robbery sentence. This

---

[4]Defendant does not argue that such an error would constitute second prong or structural error.

argument is unavailing. The Code requires a finding that consecutive sentences are necessary to protect the public "from further criminal conduct by the defendant." 730 ILCS 5/5-8-4(c)(1) (West 2014). It does not require a finding that the public needs to be protected from one particular criminal offense or another. To find that the court was required to repeat all of its earlier comments in imposing the robbery sentence would be irrational. The court put its finding and the rationale for that finding on the record, and that was sufficient to satisfy the requirements of the Code. *Span*, 337 Ill. App. 3d at 241.

¶ 76    In closing, defendant argues that the court, even if it did make the required findings, nevertheless abused its discretion by concluding that consecutive sentences were necessary to protect the public. We disagree. Defendant's record showed numerous and constant criminal convictions, including at least three felonies. As the court observed, certain of these offenses, such as aggravated battery, reckless discharge, and domestic battery, were crimes of violence. Given this record, we cannot say that the court's determination that consecutive sentences were necessary to protect the public was arbitrary, fanciful, or unreasonable. *People v. Buckner*, 2013 IL App (2d) 130083, ¶ 36.

¶ 77                                III. CONCLUSION
¶ 78    The judgment of the circuit court of Rock Island County is affirmed.

¶ 79    Affirmed.